# EXHIBIT 2

*United States v. Watts, et al.*, Case No. 1:12-cr-00087
Government's Response to Defendant Watts' Sentencing Memo

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 12 CR 87-1 |
| v. | ) | |
| | ) | Hon. Sharon Johnson Coleman |
| RONALD WATTS | ) | |

**GOVERNMENT'S RESPONSE TO
DEFENDANT RONALD WATTS' SENTENCING MEMORANDUM**

As a Chicago Police officer, defendant Ronald Watts took an oath to serve and protect the residents of Chicago from crime. He swore to bring criminals to justice. He swore to act with honor and integrity. He swore to play by the rules and enforce the rule of law to guarantee that the constitutional and civil rights of Chicagoans were protected. For years, however, the defendant used his badge and his position as a sergeant with the Chicago Police Department to shield his own criminal activity from law enforcement scrutiny. He recruited another CPD officer into his crimes, stealing drug money and extorting protection payments from the drug dealers who terrorized the community that he, the defendant, had sworn to protect. Ultimately, he was brought to justice in the same way as so many other criminals who come before this Court – in an FBI undercover sting operation.

To hold the defendant accountable for his crimes, for his abuse of his authority as a sworn Chicago Police officer, for the damage that he caused to the reputation of all other sworn law enforcement officers who uphold their oath to serve and protect, a sentence of 36 months' imprisonment is sufficient, but not greater than necessary.

## I.    NATURE AND CIRCUMSTANCES OF THE OFFENSE

As set forth in the government's version of the offense and admitted by co-defendant Kallatt Mohammed, beginning no later than December 11, 2007 through at least May 22, 2008, the defendant and Watts covered the Ida B. Wells public housing complex as part of the duties with the Chicago Police Department.  Like so many other housing projects, crime, drug dealing, and gang activity plagued the residents living in that community.  The defendant, a sergeant working out of the Chicago Police Department's 2nd District, and Mohammed, a junior CPD officer, worked together, seemingly to protect the residents of the complex.  Instead, however, they protected the heroin and crack cocaine dealers, extorting protection payments from them in exchange for agreeing not to arrest them.  Mohammed estimated that he picked up between $20,000 and $25,000 in these protection payments for the defendant and at the defendant's direction.

Some of the protection payments were made by individuals who, unbeknownst to Watts and Mohammed, were cooperating with the government.  Specifically, Watts and Mohammed took four payments totaling $3,700 from Individual A while Individual A was working with the government.  Watts and Mohammed also took two payments, totaling $1,000, from Individual B while Individual B was working with the government.  Individual A and Individual B also reported that they and others made numerous additional protection payments to Watts and Mohammed as part of the day-to-day workings of the drug trade in the Ida B. Well housing complex.

By virtue of his badge, his rank, and his authority as an officer with the Chicago Police Department, the defendant thought himself untouchable for the crimes that he was committing.  As explained by the cooperating source (the CS) and summarized in the government's version, the CS first met the defendant in 2007 or 2008, when the defendant and Mohammed approached

him in a building at the Ida B. Wells housing complex and tried to get the CS to give them information about drug-dealing activities in the complex. The CS understood that the defendant was not looking for assistance with his police work but, instead, wanted to seize drugs in the complex to either sell or use to pay off other individuals who were giving him information about drug activities in the complex. The CS declined to give information to the defendant because he did not trust him, but the defendant persisted in trying to get the CS to work with him. At times, the defendant threatened to plant drugs on the CS and then arrest him for them. At one point, the defendant had other officers falsely arrest the CS on drug charges. The CS understood that as a homeless, unemployed alcoholic, he had no chance of successfully fighting against a corrupt cop who appeared to operate within the confines of the justice system. As a result, the CS pleaded guilty and received a sentence of two years' imprisonment.

After he was released from prison, the CS was approached by two Chicago Police officers, who asked him to help them in their investigation of the defendant and Mohammed. The CS agreed, leading to two undercover sting operations conducted by the FBI.

### A. March 2010 Undercover Operation

In February 2010, the CS, as a ruse and at the direction of law enforcement, told the defendant that he sometimes carried bags containing drugs or drug proceeds for drug dealers. A month later, in March 2010, the CS met with the defendant, who asked the CS whether the CS still transported the backpacks for drug dealers. The CS told the defendant that he had missed two opportunities to "get," meaning steal, the backpacks from the CS and that the CS had seen money inside the backpack on one occasion. The defendant then directed the CS to call him thirty minutes before the CS knew that the CS would be getting a backpack to carry for the drug dealers. On March 30 and 31, 2010, the CS and the defendant spoke by phone several times and

discussed the details of where and when the CS would carry purported drug proceeds for the drug dealers.

On March 31, 2010, FBI agents met with the CS in the vicinity of 24th Place and State Street, equipped the CS with a concealed recording device, and gave the CS a bag containing $11,650 in federal law enforcement funds -- the purported drug proceeds. A short time later, the defendant approached the CS, pretended to arrest him, and took the bag containing the money. During this encounter, the CS convinced the defendant not to actually take the CS to the police station and book him. The CS explained to the defendant that he, the CS, could convince the "drug dealers" that the CS had been robbed of the drug proceeds. The defendant then handed the CS a stack of cash from the bag (which turned out to be $770) and let him go.

### B.     November 2011 Undercover Operation

On  November 18, 2011, the defendant and the CS spoke to each other in a recorded phone conversation. During the call, the CS told Watts, "I got one going on," meaning that he was going to be carrying a bag with drug proceeds. The defendant responded, "When?" The CS said that it was going to happen no later than "Monday." The defendant then said, "Make sure you call me."

On November 21, 2011, at approximately 12:45 p.m., the CS called the defendant and, in another recorded conversation, told him, "It's gonna go on. I got to meet them at McDonald's on twenty-sixth," referring to the drug dealers who were going to give him the bag of drug proceeds. The defendant confirmed the location. The CS then explained that he was going to pick up a bag from one car and walk it to another car on 29th Street. The CS said that he was supposed to be at McDonald's in one hour. The defendant then told the CS that he was also going to be there in his car. The defendant then called Mohammed and recruited him to meet up with the CS and take the bag from him. A short time later, at approximately 12:55 p.m., the CS placed another

recorded phone call to the defendant. During the call, the defendant asked the CS if he was "headed up that way now?" The CS responded, "In a few minutes." The defendant then told the CS, "I'll be in the area."

At about 1:13 p.m., law enforcement dropped the CS off near the intersection of 26th Street and Martin Luther King Drive. After the CS walked in the area for a bit, an undercover CPD officer, in the guise of a drug dealer delivering drug proceeds, approached the CS in a vehicle at the nearby McDonald's, and handed the CS a black bag containing $5,200. The CS then walked, carrying the bag, to South Vernon Street.

At approximately 1:56 p.m., Mohammed approached the CS near 2795 South Vernon and took the bag containing $5,200 from CS. A short time later, the CS called the defendant to complain that Mohammed had not given him any of the money. The defendant then told the CS to meet him at a nearby White Castle restaurant.

A few minutes later, the defendant and Mohammed met in the area of 5700 and 5800 South Princeton Avenue, Chicago, Illinois. According to Mohammed, the defendant got into Mohammed's car and Mohammed saw that the defendant was armed. According to Mohammed, they drove together briefly while the defendant retrieved the money from the bag and then dumped the bag in an alley.

Later that afternoon, the CS met with the defendant in the parking lot near the intersection of 22nd Street and Archer Street in Chicago. As captured on the recording devices concealed on the CS, the CS said to Watts, "About time. . . . Man, I thought you was fittin' to mess over me, man." The defendant responded "No, never doubt, brother, a'ight? Who always takes care of you?" The CS replied "You do, Watts." The defendant then said "There's five

large, brother," and handed the CS some cash, which turned out to be $400 of the money that had

been taken from the CS by Mohammed earlier that day.

## II. THE PRESENTENCE INVESTIGATION REPORT

### A. The Defendant Qualifies for a Two-Level Enhancement for Being a Leader or Organizer.

As set forth above, the defendant, a sergeant, recruited a junior police officer,

Mohammed, and directed him to assist him in taking the bag of cash from the CS on November

21, 2011. Mohammed then carried out the task of taking the bag of cash from the CS and

delivering it to the defendant. As a result, the defendant qualifies for a two-level level

enhancement to his base offense level, pursuant to USSG § 3B1.1(c), for being an "organizer,

leader, manager, or supervisor in any criminal activity." In an oversight, the government failed

to seek this enhancement in its government's version of the offense, and the U.S. Probation

Officer similarly did not include the enhancement in the Presentence Investigation Report (PSR).

Regardless, the evidence proves that the defendant organized the offense and exercised authority

and control over Mohammed. He should therefore receive this enhancement.

In determining whether a defendant acted as an organizer, leader, manager, or supervisor,

the Seventh Circuit has held that courts "may consider the factors outlined in Application Note 4

to § 3B1.1(c), including the degree of control and authority the defendant exercised over others."

*United States v. Vaughn*, 772 F.3d 918, 935 (7th Cir. 2013) (citing *United States v. Weaver*, 716

F.3d 439, 443 (7th Cir. 2013)). Several of the factors in Application Note 4 favor applying this

enhancement to the defendant. First, he planned and organized the offense. He was the point of

contact with the CS and coordinated with the CS as to where and when the CS would be carrying

the money so that it could be stolen from the CS. Second, he recruited an accomplice –

Mohammed. After making the arrangements with the CS, the defendant contacted Mohammed

and asked for his help in taking the money from the CS. Third, the defendant claimed a larger share of the proceeds of the crime. According to Mohammed, the defendant kept all but $200 of the stolen money. Finally, as Mohammed's sergeant and the organizer of this criminal activity, the defendant exercised control and authority over Mohammed. Based on all of these factors, the two-level enhancement pursuant to § 3C1.1(c) should apply to this defendant.

**B.     The Defendant Should Receive a Two-Level Enhancement for Possessing a Firearm in Connection with the Offense.**

The government agrees with the recommendation in the PSR that the defendant should receive a two-level enhancement, pursuant to § 2B1.1(b)(14), because he possessed a firearm in connection with the offense of conviction. *See* PSR at 8, ¶ 24. The defendant disputes the application of this enhancement, arguing both that there is insufficient proof that he was carrying a firearm and that even if he was carrying a firearm, there is no proof that the firearm was possessed in connection with the offense. Given the evidence in this case, the enhancement applies.

First, the preponderance of the evidence proves that the defendant was armed during the theft. As the PSR notes, "[c]o-defendant Mohammed repeatedly acknowledge that he was armed during his commission of the instant offense. He also stated that the defendant was armed with a handgun when the two retrieved the bag containing the $5,200." *Id.* Second, it is reasonable to conclude that the defendant carried a gun to protect himself in case the drug dealers, who he believed to be real, detected the theft and followed the CS or Mohammed back to the defendant. As far as the defendant knew, he was involved in stealing from a potentially dangerous drug organization. The defendant was a police officer involved in a covert operation – an illegal operation—but an operation nonetheless. Carrying a gun provided some measure of security to him. Third, even off-duty officers with the Chicago Police Department are obligated to respond

to emergencies, even while off the clock and out of uniform,[1] and, for this reason, are allowed to carry their badge and service weapon. Just because he was a police officer who may have been carrying a gun that day anyway does not preclude the application of this enhancement. Accordingly, the government requests that the Court accept the recommendation in the PSR that the two-level enhancement pursuant to § 2B1.1(b)(14) applies.

### C. Total Offense Level

The defendant's sentencing memorandum accurately states the remaining guidelines calculation as set forth in the PSR. In sum, the PSR concludes that the total offense level is 12, which includes as relevant conduct the March 2010 undercover operation, and defendant has a criminal history category of I. PSR at 8, ¶ 32; 9, ¶ 36. As a result, the PSR concludes that the advisory guidelines range is 10 to 16 months' imprisonment. PSR at 18, ¶ 92. With the addition of the two-level enhancement for the defendant's role as a leader or organizer, it is the government's position that the total offense level is 14, resulting in an advisory guidelines range of 15 to 21 months' imprisonment.

### III. DEFENDANT'S HISTORY AND CHARACTERISTICS

By many accounts, the defendant is a loving father and a good friend. He successfully performed some of his duties as a law enforcement officer, receiving the awards and recognition offered by the defendant with his sentencing memorandum. None of these qualities, however, explains why the defendant chose to betray his oath as a police officer and the people he swore to protect with years of crime. Despite his years of service in the military and the Chicago Police

---

[1] "Every member must also be constantly aware that while technically off duty he is subject to respond to any emergency requiring his service." Rules and Regulations of the Chicago Police Department, effective January 12, 2011, *available at* http://www.chicagopolice.org/2013MayDirectives/data/a7a57bf0-12d7c186-a4912-d7c1-8b12822c2ca106c4.html.

8

Department, where the qualities of honor, integrity, and honesty are esteemed and expected, the defendant chose to support those very criminals he was expected to bring to justice. He chose to turn a blind eye to the drug trafficking and crime in order to enrich himself with the drug money that he extorted from the drug dealers and stole from their couriers. The good qualities from which those closest to him benefitted are the same qualities that should have prevented him from engaging in the crimes that bring him before the Court for sentencing.

## IV. FOR THIS DEFENDANT, A SENTENCE OF 36 MONTHS' IMPRISONMENT IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY.

A sentence of 36 months' imprisonment for this defendant best reflects the serious nature and circumstances of the defendant's crime, his history and characteristics, and the goals and purposes of sentencing, as set forth in 18 U.S.C. § 3553(a). A sentence of 10 months or less, as requested by the defendant, is simply not enough.

At the outset, the government acknowledges that a sentence of 36 months' imprisonment is an above-guidelines sentence; however, it takes into account the severity of the charged conduct, as well as the uncharged conduct from 2007 and 2008, to which co-defendant Mohammed stipulated in his plea agreement and for which he was held accountable. To fashion a sentencing recommendation, the government looked to what the sentencing guidelines would ordinarily recommend for the uncharged extortion conduct. Specifically, the government calculated that the offense level for that conduct would be 20, pursuant to § 2C1.1, with a base offense level of 14, a 2-level enhancement for more than one extortion, a 4-level enhancement because defendant held a sensitive position, a 2-level enhancement for defendant's supervision and management of Mohammed in carrying out the offense, and a 2-level reduction for acceptance of responsibility. After applying the grouping rules, the resulting offense level for the charged and uncharged conduct would be a 21, with an advisory guidelines range of 37 to 46

months' imprisonment. Thus, the government's recommendation is slightly below what it believes the guidelines would be if the defendant had admitted to the extortion conduct as a stipulated offense.

### A. Need for Sentence to Reflect Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

With his crimes, the defendant not only enriched himself with the drug money that was earned by the drug dealers who peddled poison – heroin and crack cocaine – into the community, he undermined the criminal justice system. Sworn law enforcement officers are held to a higher standard of conduct, not only because of the authority that they enjoy, but because society relies on their trustworthiness, their honor, and their integrity in upholding and enforcing the laws that protect the community.

Every time the defendant chose to take cash from the drug dealers, to turn a blind eye to their crimes, and to risk the safety of a homeless man who purportedly carried bags of cash for drug dealers, the defendant gave the community reason to doubt law enforcement, reason to challenge its authority, reason to believe that law enforcement cannot be trusted. He supported the criminal activities in the same community that he had sworn to protect. With his crimes, the defendant gave the community reason to doubt the all other law enforcement officers, to challenge their truthfulness in court and in their administration of their duties, and to challenge the legitimacy of warrants, prosecutions, and convictions in the criminal justice system. His sentence should speak to all of that.

### B. The Need for Deterrence

#### 1. General Deterrence

The defendant's sentence should account not only for his crimes but should send a message to the law enforcement community -- to good cops and bad cops alike -- that they will

be prosecuted and punished to the fullest extent of the law when they use their position to commit crimes. In doing so, it helps to restore the legitimacy of the criminal justice system that was tarnished by the defendant's crimes.

Moreover, the difficulty inherent in detecting and successfully prosecuting corrupt law enforcement officers further demonstrates the need for the defendant's sentence to deter other law enforcement officers from engaging in similar behavior. Just as the CS recognized that he would be unsuccessful in challenging the accusations of sworn law enforcement officers against him within the criminal justice system, police officers like the defendant have benefitted from the expectation that their word will be accepted over their challengers. The CS knew that no one would believe him; they would believe the cops who risked their lives working in the dangerous, drug-infested housing projects. It was precisely that sort of thinking that allowed the defendant and Mohammed to carry out their extortion of drug dealers, to steal drugs, and to steal drug money for so long. The defendant's sentence should send the message that he committed serious crimes that cannot and will not be tolerated so as to deter others in the law enforcement community from committing or concealing similar crimes.

### 2. Specific Deterrence

Although the defendant will never serve as a sworn law enforcement officer again, his crimes suggest the need for specific deterrence. He was a sworn Chicago Police Officer who used his position for his own illegal financial gain. Due to his conviction and sentence, the defendant will likely find himself in more desperate circumstance. He no longer holds the steady, well-paying job of a police sergeant. Instead, he is a convicted felon; a thief. That he was willing to accept money from the drug traffickers in exchange for turning a blind eye to their illegal activities while a police officer suggests that the defendant may likewise attempt to engage in criminal activity in the future when his circumstances are more desperate. While the

government hopes that this is not the case, his sentence should send keep him out of the community and from committing crime for a long enough period of time to deter him from engaging in criminal activity in the future. A sentence of 36 months' imprisonment accomplishes that goal.

## V. CONCLUSION

For all of these reasons, the government respectfully requests that the Court impose a sentence of 36 months' imprisonment.

Respectfully submitted,

GARY S. SHAPIRO
United States Attorney


By:  s/Margaret J. Schneider
MARGARET J. SCHNEIDER
MEGAN CUNNIFF CHURCH
Assistant United States Attorneys
219 S. Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-1875

Date: October 2, 2013