**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| In re: WATTS COORDINATED PRETRIAL PROCEEDINGS, | ) ) ) ) ) | Master Docket Case No. 19 C 1717<br><br>Judge Franklin U. Valderrama<br>Magistrate Judge Sheila Finnegan |

## ORDER

Plaintiffs in some 73 pending cases have alleged that current and former Chicago Police Department officers – led by former Sergeant Ronald Watts and, in a majority of cases, former Officer Kallat Mohammed – fabricated drug or gun charges against Plaintiffs, leading to their false arrests and wrongful convictions. The cases have been consolidated for coordinated pretrial proceedings. Currently before the Court is Plaintiffs' Motion For A Protective Order To Prohibit Defendants From Asking Plaintiffs About Uncharged Alleged Criminal Activity [124] pursuant to Federal Rules of Civil Procedure 26(c) and 30(d).[1] In the motion, Plaintiffs assert there is good cause for a protective order barring Defendants from asking certain questions at their depositions, primarily about uncharged criminal conduct occurring after 2008. For reasons discussed below, the motion is denied.

## BACKGROUND

### A.     Underlying Criminal Cases

---

[1] The motion was filed by the Plaintiffs represented by Loevy & Loevy. The approximately 19 Plaintiffs represented solely by counsel at Kenneth N. Flaxman P.C. have not joined in the motion. References to "Plaintiffs" in this opinion are limited to those represented by counsel from the Loevy firm, as well as one who is represented by counsel from both the Loevy and Flaxman firms.

The arrests giving rise to the 73 pending cases largely took place at the now-defunct Ida B. Wells Housing Complex (the "IBW Complex"), and in the timeframe from 2002 through 2008. Plaintiffs allege that while Defendant officers were assigned to patrol the IBW Complex, they fabricated drug and gun charges, prepared false police reports, or testified falsely in criminal proceedings, resulting in the Plaintiffs being wrongfully convicted of one or more crimes. In 2012, Defendants Watts and Mohammed were charged with one count of theft of government funds after stealing drug proceeds from an FBI cooperating witness, to which both pleaded guilty. (Doc. 153, 8/10/2020 Order, at 2) (citing Information [27], 12 CR 86, at 1; Mohammed Plea Agreement [43] ¶¶ 1–5; July 19, 2019 Order [73]). Mohammed's plea agreement stipulated that he, along with Watts, demanded money from drug dealers working in the Ida B. Wells Housing Complex in exchange for not arresting them. (*Id*.) (citing Mohammed Plea Agreement [43] ¶ 7).

Additional scrutiny of Watts and Mohammed's tactics resulted in the Cook County State's Attorney's Office, through its Conviction Integrity Unit, reviewing criminal convictions in which these officers had been involved. Over time, the State's Attorney's Office has moved to vacate some 94 cases. (*See* Cook County State's Attorney's Office press release dated 2/11/2020, https://www.cookcountystatesattorney.org/news/state-s-attorney-kimberly-foxx-moves-vacate-additional-tainted-convictions-tied-former-chicago, last visited December 17, 2020). Plaintiffs are among those who have had their convictions vacated.

In their civil rights lawsuits that followed, Plaintiffs assert numerous claims against the Defendant officers, including: (1) violation of due process rights, malicious prosecution, violation of First Amendment rights, failure to intervene, and conspiracy, all

pursuant to 42 U.S.C. § 1983; and (2) state law claims for malicious prosecution, intentional infliction of emotional distress, conspiracy, and loss of consortium. Plaintiffs also contend that the City of Chicago is liable for the officers' federal violations under *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658 (1978), and liable for the officers' state law violations under principles of *respondeat superior* and state-law indemnification. While the specific allegations vary by case, Plaintiff Phillip Thomas ("Thomas") has alleged by way of example that he lived nearby the IBW Complex. On May 14, 2007, he was arrested by certain Defendants, and later convicted "for a crime that never happened; it was completely fabricated by Chicago police officers." (18 C 5132, Doc. 1, at 2). The arrest occurred after those Defendants demanded information about drugs and Thomas said he had none to provide. (*Id*. at 7). After striking him on the face and body several times, the Defendants transported Thomas to the police station and then "worked together to create false and fabricated police reports about [his] alleged possession of controlled substances." (*Id*.).

**B.    Discovery Dispute**

The parties are proceeding with coordinated discovery in all pending cases. During the deposition of Plaintiff Phillip Thomas, a dispute arose concerning the proper scope of questioning on the topic of his criminal history. Through the meet and confer process, the parties have resolved the dispute as to Thomas. (Doc. 124, at 4). Unable to reach an agreement with Defendants to declare certain questions about Plaintiffs' criminal history off limits at future depositions, Plaintiffs seek a protective order to prohibit these questions.

While Plaintiffs have altered their position somewhat in their reply memorandum (that modification is discussed later), the motion seeks to bar all questions about uncharged criminal conduct occurring after 2008. In addition, as to charged criminal conduct after 2008 (i.e., conduct for which Plaintiffs were arrested or convicted), the motion seeks to preclude questions about the identity of other participants who were never charged and are not mentioned in police reports.[2] Plaintiffs selected 2008 as the cutoff year because the underlying arrests by Defendants at issue in these lawsuits occurred in the time period 2002 through 2008, and the IBW Complex (where most were arrested) reportedly closed in 2008. (Doc. 124, at 3).[3]

---

[2] While the Court's focus here is on the questions that would be barred under a protective order were the motion granted, the parties also describe in their filings the types of questions they have agreed Plaintiffs will answer, and so are not the subject of the motion:

> Through the meet-and-confer process, Plaintiffs have agreed that Thomas and all other Loevy and Loevy Plaintiffs will answer questions regarding criminal and drug-related activity that occurred in the Ida B. Wells, including the identities of drug dealers, whether certain Plaintiffs or other witnesses were involved in drug-related activity, and the details of any drug-related activity that they engaged in at the Ida B. Wells.

(Doc. 138, at 3).

[3] There is some confusion as to Plaintiffs' proposed end date for asking about uncharged criminal activity. Plaintiffs say "there is a dispute as to whether Defendants may ask questions going forward about whether Plaintiffs have committed potentially illegal acts *after the Ida B. Wells housing development was torn down* if those acts did not lead to arrests or convictions." (Doc. 124, at 6) (emphasis added). Since they also say that complex was "closed" in 2008, this appears to be the proposed cutoff date. (*Id.* at 3) (citing https://chicagotribune.com/news/ct-xpm-2008-08-11-0808100304-story.html, last visited December 17, 2020) (indicating that the final three buildings were scheduled to close in August 2008). Other reports, however, indicate that the demolition was completed in 2011. *See* https://en.wikipedia.org/wiki/Ida_B_Wells_Homes, last visited December 17, 2020) (noting that the demolition began in 2002 and ended in 2011). In addition, Plaintiffs at times say they are willing to answer questions about "any uncharged conduct that may have occurred *during the years when Plaintiffs lived at or visited*" the IBW Complex. (*See* Doc. 124, at 4; Doc. 140, at 2) (emphasis added). This suggests the proposed end date for asking about uncharged criminal activity is the date each Plaintiff ceased living at or visiting the IBW Complex, which may be unclear or disputed. Finally, certain Plaintiffs (e.g., Anthony McDaniels or Bruce Powell) were arrested by Defendants at a location other than the IBW Complex. (Doc. 138, at 3 n.5). It is unclear whether the limitations sought in the motion were

## DISCUSSION

### A.    Lack of Good Cause for Protective Order

Federal Rule of Civil Procedure 30(d) provides that "a party may move to terminate or limit [a deposition] on the ground that it is being conducted in … a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party."  FED. R. CIV. P. 30(d)(3).  If a motion is filed, "[t]he court may order that the deposition be terminated or may limit its scope and manner as provided in Rule 26(c)."  *Id.*  Rule 26(c), in turn, provides that "[t]he court may for good cause issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."  FED. R. CIV. P. 26(c)(1).  The party seeking the protective order "bears the burden of demonstrating why the order should be entered."  *Stanek v. St. Charles Comm. Unit Sch. Dist. #303*, No. 13 C 3106, 2020 WL 1304828, at *3 (N.D. Ill. Mar. 19, 2020).  Notably, to show good cause, the movant must submit "a particular and specific demonstration of fact."  *Flores v. Bd. of Trustees of Comm. College Dist. No. 508*, No. 14 C 7905, 2015 WL 7293510, at *3 (N.D. Ill. Nov. 19, 2015) (quoting *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 n.16 (1981)). "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning are insufficient."  *Id*.

Given these requirements, Plaintiffs face an uphill battle in demonstrating good cause, for they bring their motion on behalf of approximately 55 different Plaintiffs, each of whom has filed a separate lawsuit.  But "[w]hether a discovery request imposes undue embarrassment or humiliation is a case– and fact-specific question."  *Flores*, 2015 WL 7293510, at *3.    Here the eight-page motion understandably omits the specific

---

meant to apply to them and why.  Since the Court is denying the motion for a protective order, there is no need for clarification on these issues.

circumstances of any individual Plaintiff and an explanation of why the need to answer the questions at issue would cause undue embarrassment or oppression. Of course, the circumstances (including the criminal history) of the individual Plaintiffs are not identical, so one cannot assume they all would experience the same harms and to the same degree if required to answer questions about uncharged criminal activity. Notably, Plaintiffs do not seek to bar questioning about charged and uncharged criminal conduct before 2008, or about charged conduct after 2008 (except as to the identity of other participants not identified in police reports). This raises the question as to why additional questions – focused on uncharged criminal conduct after 2008 – would lead to undue embarrassment, annoyance or oppression sufficient to justify a protective order.

Under the law, the approximately 55 Plaintiffs cannot be lumped together and a finding made on behalf of all – based on broad allegations of harm unsubstantiated by specific examples – that good cause exists to deviate from the normal discovery rules and shield them from the deposition questions at issue. On the sparse record here, the Court has no basis to find that all Plaintiffs necessarily would suffer undue embarrassment, annoyance, or oppression if required to answer questions about uncharged criminal conduct after 2008. *See Flores*, 2015 WL 7293510, at *3 (denying motion for protective order where the plaintiff's "arguments lack concrete examples or support."). Courts have recognized that "extensive intrusion into the affairs of both litigants and third parties is permissible and common in modern discovery, especially in a case . . . involving claims of emotional trauma." *Id*. And as noted, "[g]eneralized claims

of embarrassment do not establish good cause." *Hollinger Int'l Inc. v. Hollinger Inc.*, No. 04 C 698, 2005 WL 3177880, at *3 (N.D. Ill. Jan. 19, 2005).[4]

## B.    Relevance of the Discovery Sought

As part of their motion for a protective order based on the harms they would suffer from answering the deposition questions at issue, Plaintiffs also argue that those questions seek irrelevant information.   Defendants disagree, and articulate why they believe the questions seek information relevant to multiple issues in the case, including Plaintiffs' damages, ability to recall details of their arrests, and connections between Plaintiffs and Rule 404(b) witnesses that would establish bias.

Before examining these relevancy arguments more closely, it is helpful to review the scope of discovery and the definition of relevant evidence, for a constant refrain in Plaintiffs' motion is that Defendants are attempting to improperly "fish" for irrelevant information that would be inadmissible at trial.   (Doc. 124, at 1, 4, 5; Doc. 140, at 1, 2, 3, 6, 9).   But this case is in the discovery stage, and Federal Rule of Civil Procedure 26(b) explicitly states that information within the scope of discovery "need not be admissible in evidence to be discoverable."   Instead, unless limited by the court, Rule 26(b) allows discovery of "any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case" considering a number of factors.   FED. R. CIV. P. 26(b).[5]   Information is deemed relevant under the Federal Rules of Evidence if "(a) it has any tendency to make a fact more or less probable than it would be without the

---

[4]      Plaintiffs offer two additional and novel arguments for a protective order that are discussed later in this Opinion. *See infra* at 16-20.

[5]      These factors are: the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.   FED. R. CIV. P. 26(b).

evidence; and (b) the fact is of consequence in determining the action." FED. R. EVID. 401.

Moreover, as part of the discovery process, "fishing" is permissible provided it is done within the bounds of Rule 26(b). *See Whiteamire Clinic, P.A., Inc. v. Quill Corp.*, No. 12 C 5490, 2013 WL 5348377, at *6 (N.D. Ill. Sept. 24, 2013) ("It is part and parcel of the discovery process for parties to make discovery requests without knowing what they will get, or indeed, whether they will get anything at all. In that sense, most discovery involves an element of "fishing.'"); *Craftwood II, Inc. v. Generac Power Sys., Inc.*, No. 17 C 4105, 2018 WL 497282, at *2 (N.D. Ill. Jan. 22, 2018) (rejecting the assertion that the depositions sought were part of a "fishing expedition that [would] yield nothing of value" as "judges are not clairvoyant. . . . And neither are lawyers.") (internal citations omitted). Finally, as Plaintiffs themselves state, there is a "broad scope of permissible deposition questions" and "a deponent may not refuse to answer a question merely because the question seeks irrelevant information." (Doc. 124, at 5-6).

For these reasons, Plaintiffs would have little hope of preventing the discovery at issue were they to rely solely on a claim of lack of relevancy or admissibility. Here, Plaintiffs instead seek to bar the discovery through a protective order due to the alleged harms they would suffer if required to answer the deposition questions. In that context, Plaintiffs suggest there is no countervailing reason to allow the discovery since they contend their answers to the questions would provide only irrelevant and inadmissible information. As noted, Defendants disagree, asserting the discovery seeks information that would be relevant to multiple issues in the case, which the Court now addresses in turn.

### 1. Damages

Defendants first argue that information about the uncharged conduct at issue is relevant to the issue of damages. Plaintiffs not only assert claims for intentional infliction of emotional distress, but they also say that as a result of their wrongful convictions, they have suffered "incalculable damage, including psychological damage, anguish, and humiliation," as well as "the destruction of their reputations, the disruption of their life and intimate relationships, and the suspension of their ability to pursue a career and raise a family." (Doc. 138-2, Plaintiffs' Rule 26(a)(1) Disclosures, at 33). Because of this, Defendants assert they are "entitled to inquire as to subsequent criminal activity and drug-related activity which may tend to negate the types of damages Plaintiffs claim to have suffered." (Doc. 138, at 9). They reason, for example, that "[a] daily drug habit, regardless of amount, could certainly affect how one lives their life, including their interaction with family members or neighbors and getting and holding down a job, which are among the types of damages the Plaintiffs are seeking in this case." (*Id*. at 8).[6]

Defendants also contend that by seeking to recover for emotional damages, Plaintiffs have put their character and conduct at issue. (*Id*. at 6) (citing *Cobige v. City of Chicago*, 651 F.3d 780 (7th Cir. 2011)). Plaintiffs disagree, insisting that Defendants have failed to explain "why a Plaintiff would be entitled to lower damages for their wrongful conviction if he or she used drugs or committed some other crime many years after their wrongful conviction." (Doc. 140, at 4-6) (citing *Nelson v. City of Chicago*, 810 F.3d 1061 (7th Cir. 2016)).

---

[6] Defendants say there is reason to believe a number of Plaintiffs have used narcotics for an extended period. (Doc. 138, at 7).

As an initial matter, both *Cobige* and *Nelson* involved disputes over the admissibility of evidence at trial rather than its discoverability in the face of a protective order. In *Cobige*, the plaintiff sued for wrongful death after his mother died in a police lock-up. The Seventh Circuit held that the trial court should have admitted evidence that the decedent was a drug addict and in trouble with the law for much of her adult life, spending multi-year stretches in prison. 651 F.3d at 782, 784. Such evidence was admissible, the court held, because the decedent's "character and life prospects were put in question by her son's testimony." *Id*. at 784. According to the plaintiff's testimony, his mother "had been a friend as well as a parent, a bulwark of support and a role model throughout his life." *Id*. at 784. Under these facts, the court reasoned that just as the plaintiff was entitled to "paint a favorable view of his mother's ability to give sage advice and emotional support," the defendant "was entitled to introduce evidence suggesting that [the decedent] was not likely to assist others or to have enjoyed life to the extent that her son narrated." *Id*. at 784-85. *See also U.S. v. Mendoza-Prado*, 314 F.3d 1099, 1105 (9th Cir. 2002) (plaintiff opened the door to evidence of his drug trafficking by testifying that he was "a working man and a family man," who was "not interested in that narcotics and stuff," and "was afraid to get involved in some drugs.").

Plaintiffs argue that the holding in *Cobige* must be construed narrowly, based on another civil rights case, *Nelson*, where the Seventh Circuit found the trial court erred by admitting the plaintiff's arrest history to refute emotional distress damages. In that case, the plaintiff "carefully limited his claimed emotional injury to the fear he felt during the 30 minutes of the traffic stop itself," and "never claimed that the experience left him fearful of the police more generally." 810 F.3d at 1069. Thus, the court found the plaintiff's entire

arrest history should not have been admitted to distinguish between damages attributable to the alleged false arrest and those attributable to a subsequent arrest. *Id*. at 1068. As the court observed, this

> would seemingly permit any civil-rights plaintiff's criminal history to come in on the issue of emotional-distress damages, no matter how tenuous a connection the evidence has to the issue of damages or how central a role emotional distress plays during the plaintiff's case. This, of course, would be contrary to our prior statements instructing courts to proceed carefully when deciding to admit evidence of a § 1983 plaintiff's criminal past.

*Id*. at 1068-69.

What is apparent from both *Cobige* and *Nelson* is the fact intensive nature of these inquiries. This underscores why admissibility determinations cannot (and should not) be made at this early discovery phase of the case. The district judge must make these determinations in individual cases after the parties identify the "evidence" they seek to admit and summarize the Plaintiff's specific testimony concerning the nature, source, and duration of his or her damages. If the Court were to enter a protective order here based on Plaintiffs' unsupported allegations of harm, then Defendants would never get the discovery and there would be no opportunity to argue admissibility before the district judge. Absent a showing of good cause for entry of a protective order, there is no basis for denying Defendants the discovery they seek based solely on Plaintiffs' broad claims that the resulting (and currently unknown) evidence would necessarily be irrelevant.

## 2. Credibility, Memory, and Recollection of Events, and Plaintiffs' Modifications to Proposed Protective Order

Defendants say they also seek to question Plaintiffs about potential uncharged criminal conduct after 2008 for another reason. Given the long passage of time since the arrests at issue, they wish to explore "whether or not Plaintiffs can credibly testify about

what happened during their arrest and what other factors may be present in their lives that would affect their ability to accurately recall what happened."  (Doc. 138, at 13). Defendants argue that "[e]vidence of a witness's drug use may be admitted to show the effect of the drug use on the witness's memory or recollection of events." (*Id.*).  *See also Jarrett v. United States*, 822 F.2d 1438, 1446 (7th Cir. 1987) (a witness's "ability to perceive the underlying events and testify lucidly at trial" may be attacked through evidence of the witness's use of illicit substances).

        In their reply brief, Plaintiffs acknowledge "it may be true in the abstract that heavy drug use can impact memory[,]" but say Defendants "offer no evidence" that any Plaintiff engaged in such drug use.  (Doc. 140, at 7).  Plaintiffs cite no authority for their suggestion that parties must offer evidence of a fact as a predicate to seeking discovery about that fact.  Perhaps recognizing the weakness in their original argument that *any* uncharged criminal conduct after 2008 is necessarily too removed in time to be relevant, Plaintiffs propose in their reply brief a modification to the requested protective order. Instead of barring all deposition questions regarding uncharged criminal conduct after 2008, they propose that the Court allow a "limited number of questions" concerning a Plaintiff's drug use but only "if Defendants have a good faith basis to believe that a Plaintiff has used drugs in a way that might have affected his or her memory."  (*Id*.).

        Plaintiffs cite no authority for imposing such a "good faith" test in the context of a protective order or otherwise.  This new proposal also presents a number of practical problems.  First, Plaintiffs recognize that the parties are likely to disagree on what constitutes "good faith" for asking questions of a plaintiff about past drug use to discover evidence of possible memory deficits.  Plaintiffs provide no guiding standard aside from

suggesting such questions be allowed where an individual Plaintiff has prior drug arrests or convictions. (*Id*.). While Plaintiffs believe the parties will be able to "work through this issue cooperatively on a case by case basis during depositions[,]" (*Id*. at 8 n.2), this Court does not share that confidence.

A second practical concern with the modified protective order is that even for individual Plaintiffs who have drug arrests or convictions, Plaintiffs want to restrict Defendants to asking only a "limited" number of questions sufficient to develop discovery regarding a Plaintiff's memory problems. Yet Plaintiffs do not say who would decide during the deposition that the "limit" has been met. (*Id*. at 7). Nor do they explain what constitutes using drugs "in a way that might have affected" their memory. These types of restrictions are not workable and undoubtedly would lead to more litigation, delay, and expense.

Based on the record before it, the Court sees no justification for deviating from the usual discovery rules, and imposing special rules that will be difficult to apply and require the Court to micromanage the questioning of certain witnesses at depositions. As noted earlier, Plaintiffs have offered only conclusory and broad allegations of the embarrassment, annoyance and oppression they would experience if required to answer questions about uncharged criminal conduct after 2008, so have failed to meet their burden of showing good cause for a protective order that restricts the deposition questions in the manner suggested. The better course is for Plaintiffs to provide the answers to the questions. Then the parties can present any arguments about the admissibility of such evidence to the trial judge who will have the benefit of a fully developed record before ruling.

### 3. Claims and Defenses

Defendants also argue that the discovery at issue may provide information that could be used to defend against Plaintiffs' claims that Defendants fabricated the narcotics cases against them. The Court agrees with Plaintiffs that the argument on this point (as opposed to the others) is not sufficiently developed. But the Court disagrees with Plaintiffs' statement that the questions they seek to bar under the protective order necessarily concern "uncharged criminal activity that occurred 15-20 years after the wrongful convictions at issue in this case[.]" (Doc. 140, at 8). Actually, the protective order would bar questions even about uncharged criminal activity that occurred relatively close in time to the underlying incidents, such as a few months or a year. Recall that Plaintiffs were arrested by Defendants at the IBW Complex between 2002 and 2008, and the protective order, if granted, would preclude questions about any uncharged criminal conduct occurring in 2009 and later. In other words, for any Plaintiffs arrested in 2008 who engaged in uncharged criminal activity in 2009, the protective order would preclude questions about the uncharged criminal activity despite its recency. For this reason, and in the absence of a showing of good cause sufficient for a protective order, the Court declines to declare all discovery about uncharged criminal activity engaged in by all Plaintiffs after 2009 to be irrelevant for discovery purposes.

### 4. Motive, Bias, and Connections with Rule 404(b) Witnesses

Defendants have also articulated the potential relevance of discovery regarding the identities of persons with whom Plaintiffs engaged in criminal conduct after 2008. In Defendants' view, this discovery is permissible and necessary to develop evidence showing (a) potential connections and associations between Plaintiffs and their many

alleged Rule 404(b) witnesses, and (b) any potential motive, bias, or interest of such persons. (Doc. 138, at 11). Defendants offer an example to illustrate why they should be permitted to inquire about Plaintiffs' involvement in criminal conduct after 2008 – whether charged or uncharged – to "develop evidence of connections between and among the over sixty Plaintiffs and the approximately 118 alleged Rule 404(b) witnesses." (*Id*.).

The example involves Plaintiffs Ben Baker and Lamar Lewis and certain others. Baker was arrested by Defendants in July 2004. Lewis was his alibi witness at trial. (*Id*. at 12). Since then, Defendants have learned of evidence suggesting that Baker and Lewis have been involved together in drug trafficking, with Baker pleading guilty in 2017 (admitting narcotics were sold from the house he shared with Plaintiff Clarissa Glenn), and Lewis pleading guilty in federal court in 2019. (*Id*. at 11-12). Defendants believe the evidence suggests that Lewis mixed the heroin at a property belonging to Baker, in which Baker's son, Gerard Baker resided. Gerard Baker has been identified as a damages witness for his father, and allegedly was charged with state crimes stemming from the same federal narcotics investigation and also pled guilty. (*Id*. at 12). Defendants finally note that another Plaintiff, Bruce Powell, was convicted in a related investigation of drug trafficking. They wish to ask Plaintiffs Baker, Lewis, and Powell about any narcotics-related connections between them, including uncharged criminal conduct after 2008. (*Id*.).[7]

Plaintiffs contend that information about uncharged criminal conduct after 2008 is irrelevant, but without an explanation aside from the generic assertion that "there is no

---

[7]     Defendants offered additional information from FBI interview reports in support of this illustrative example. The Court is not relying on that information as it is unnecessary and the parties dispute the identity of the interviewee.

realistic possibility that the evidence about uncharged conduct that Defendants seek to discover will be admissible." (Doc. 124, at 7; Doc. 140, at 9). Plaintiffs also urge the Court to disregard the discussion of Baker's relationship with Lewis since these individuals were arrested and convicted for the post-2008 criminal conduct described in the example. And Plaintiffs' motion, they note, does not ask to bar questions about arrests and convictions – except as to the identity of other participants in the criminal activity who are unidentified in police reports.[8] Plaintiffs do not, however, respond to Defendants' argument that it would be unreasonable to impose a blanket "arrest/conviction" rule since "the mere fact that a Plaintiff was not arrested or convicted of recent narcotics-related activity should not bar Defendants from developing evidence of bias, interest, and motive of witnesses." (Doc. 138, at 12).

As noted earlier, Plaintiffs' reliance on an admissibility standard is misplaced at the discovery stage. This Court agrees that in assessing the potential relevancy of discovery, there is no basis here to draw a bright line rule and declare that questions about the identity of others with whom a Plaintiff participated in criminal activity after 2008 is potentially relevant only if the Plaintiff was arrested or convicted for that conduct, but irrelevant if the Plaintiff was not.

## C.    Safety Risk

In addition to seeking the protective order to avoid embarrassment, annoyance, and oppression from answering the deposition questions at issue, Plaintiffs offer an

---

[8]    With respect to Baker in particular, Plaintiffs suggest that if an "issue" arises during his deposition "that requires Court assistance, the parties should address that issue then." (Doc. 140, at 10). They do not say what the "issue" might be that might necessitate an interruption in the deposition to seek the Court's assistance. If the parties comply with Rule 30, there should be no need for this.

additional and novel basis for the order: a potential risk to Plaintiffs' safety if required to identify other participants in charged or uncharged criminal activity after 2008 who are not mentioned in police reports. (Doc. 124, at 7). By way of example, Plaintiffs contemplate a scenario where a Plaintiff has a drug arrest "post-dating the closure of Ida B. Wells," and Defendants ask at the deposition for identification of "the person who they purchased the drugs from, even if that person was not charged and is not identified in police reports." (*Id*.). Plaintiffs fear that disclosing this information may place their safety at risk. They provide no further explanation but presumably fear that a third party who is identified might retaliate in some way.

Defendants respond that the "bald and ominous assertion, without basis or elaboration, that answering questions about recent narcotics-related activity would create a 'potential safety risk' does not qualify as good cause." (Doc. 138, at 15). In Defendants' view, Plaintiffs' argument supports their position that the discovery is relevant: "If Plaintiffs are engaging in illicit activity that puts their safety at risk, such activity is relevant to and may contribute to any psychological or emotional issues Plaintiffs were or are dealing with." (*Id*.). There are also other scenarios where the identity of the person who would be disclosed by a Plaintiff as a participant with him in criminal conduct after 2008 may be relevant. Consider for example a situation where that person has been (or will be) disclosed as an alibi or damages witness, or possesses information about events after 2008 that bear on a Plaintiff's claims and damages (e.g., long-term drug use affecting memory, employability and family relationships).

As a matter of discovery, Plaintiffs have not persuaded the Court that there is a basis to declare the deposition questions on this topic necessarily irrelevant and bar them

outright. Notwithstanding this, a protective order may still be appropriate if Plaintiffs faced a risk to their safety if required to answer these questions. But here, the Court has only unsubstantiated and vague claims of "risk," and the fact that some Plaintiffs might disclose someone who would pose a safety risk does not mean that all would. Based on the record before it, the Court finds that Plaintiffs have failed to meet their burden of establishing good cause for the protective order based on unspecified safety concerns. *Flores*, 2015 WL 7293510, at *3 ("Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning are insufficient" to establish good cause). This ruling does not, however, foreclose any individual Plaintiff from filing a separate motion with concrete information about a safety risk for consideration by the Court.[9]

## D.    Fifth Amendment Rights

Plaintiffs finally object that questions about uncharged conduct after 2008 "might . . . potentially, and unfairly, cause Plaintiffs to invoke their Fifth Amendment rights to not be forced to incriminate themselves." (Doc. 124, at 7). The premise of Plaintiffs' argument (once again) is that the proposed questions seek irrelevant information, for they concede that a protective order should *not* be granted if Defendants' deposition questions about uncharged criminal conduct seek relevant information. (Doc. 140, at 11) ("Plaintiffs agree that if Defendants ask relevant questions that are not improper under Rule 30, and truthful answers to those questions might subject a Plaintiff to criminal liability, then the Plaintiff will have to choose between answering or invoking his or her Fifth Amendment rights."). It is only if the questions seek information that is irrelevant, or has no possibility

---

[9]    If a motion is filed, the Plaintiff should include (among other information) whether the person who would be disclosed is still alive and in a position to retaliate, and is still subject to prosecution for the criminal conduct.

of leading to admissible evidence, that Plaintiffs contend they should be shielded from making that choice. (*Id.* at 3, 11) ("But that does not mean Defendants should have unlimited leeway to seek out irrelevant information that that (sic) might cause Plaintiffs to take the Fifth when the information has no reasonable possibility of leading to admissible evidence.").

For reasons explained earlier, the Court is not persuaded that questions about uncharged criminal conduct after 2008 necessarily seek irrelevant information so are impermissible on that basis. Defendants have identified multiple ways in which answers to the questions may bear on issues such as damages, credibility and recall, and connections with Rule 404(b) witnesses. In addition, Plaintiffs have not demonstrated good cause for a protective order since they seek to insulate all Plaintiffs from answering questions about uncharged conduct after 2008 based on the broad claim that *some* Plaintiffs *perhaps* would feel it necessary to invoke the Fifth Amendment to avoid self-incrimination, and should not be put to this choice if the questions seek irrelevant information.

Plaintiffs' reliance on an inapposite and unpublished case, *U.S. Election Corp. v. Microvote Corp.*, 51 F.3d 276, 1995 WL 156561 (7th Cir. 1995), does not merit a different conclusion. Plaintiffs cite *Microvote* for the proposition that a Court does not err in refusing to inform a jury that a plaintiff invoked his Fifth Amendment rights if the invocation concerns a topic that is not relevant to the case. *Id*. at *5. *Microvote* does not speak to the issue here since (1) Plaintiffs have not established that their answers to the questions would be irrelevant, and (2) Plaintiffs seek to bar the discovery in the first place rather than provide it (as in *Microvote)* and then argue its admissibility before the trial judge. In

the event that any of the 55 Plaintiffs is faced with a deposition question to which a truthful answer would be incriminating, and opts to invoke the Fifth Amendment, the parties will have an opportunity to argue the admissibility of the evidence before the trial judge. Under *Microvote*, no Plaintiff will be prejudiced in the eyes of the jury from invoking the Fifth Amendment since the jury will never hear of this if the question that was posed has no relevancy to the issues in the case.

**E.     Summary**

To summarize, Plaintiffs have not met their burden of showing good cause for entry of a protective order that would preclude Defendants from asking approximately 55 Plaintiffs the deposition questions at issue in this motion. Nor is the Court persuaded that the unknown answers to these questions necessarily would be irrelevant to the damages and other issues that Defendants have identified.

<u>**CONCLUSION**</u>

For the reasons stated above, Plaintiffs' Motion for a Protective Order to Prohibit Defendants from Asking Plaintiffs about Uncharged Alleged Criminal Activity [124] is denied.

ENTER:

Dated: December 17, 2020

SHEILA FINNEGAN
United States Magistrate Judge