**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: WATTS COORDINATED | ) | Master Docket Case No. 19 C 1717 |
| PRETRIAL PROCEEDINGS, | ) | |
| | ) | Judge Franklin U. Valderrama |
| | ) | Magistrate Judge Sheila Finnegan |

## ORDER

Plaintiffs have each filed individual civil rights lawsuits alleging that current and former Chicago Police Department officers – led by former Sergeant Ronald Watts and, in a majority of cases, former Officer Kallat Mohammed – fabricated drug or gun charges against Plaintiffs, leading to their false arrests and wrongful convictions. The cases (filed between 2016 and 2023) were consolidated for coordinated pretrial proceedings in 2018 and now number approximately 178. In February 2023, the parties identified 19 "test cases" that would proceed to trial before other cases. Fact discovery in the test cases was then largely completed by December 18, 2023, while discovery in the non-test cases was stayed. The earliest of the test cases are set for trial beginning in January 2025.

Currently before the Court is a discovery dispute relating to 1,161 recordings of telephone calls made by nine of the test case Plaintiffs while in the custody of the Illinois Department of Corrections ("IDOC"). IDOC produced recordings in response to subpoenas issued by Defendants between 2020 and 2023. Defendants now seek to listen to the recordings, arguing they are relevant to liability and damages issues in the cases. Plaintiffs disagree and have filed a motion to quash the subpoenas and foreclose Defendants from listening to any of the calls, asserting the discovery is untimely, burdensome, and invades the privacy of the Plaintiffs without any basis to believe the

calls contain relevant information (Doc. 649).  For reasons discussed below, the motion to quash is granted in part and denied in part.[1]

## BACKGROUND

### A.    The June 19, 2020 Subpoena

Defendants first issued a subpoena to IDOC on June 19, 2020, seeking call logs and recorded calls for several Plaintiffs, including test case Plaintiffs Bobby Coleman, Milton Delaney, and William Carter.  (Doc. 668-1, at 2).  Plaintiffs did not object to the subpoena and IDOC sent Defendants 502 phone calls for those individuals.  Defendants produced copies of the calls to Plaintiffs on July 13, 2020, at which point Plaintiffs objected to Defendants reviewing them and Defendants agreed not to do so at that time.

### B.    The May 16, 2023 Subpoena

Nearly three years later, on May 16, 2023, Defendants issued another subpoena to IDOC.  Knowing that Plaintiffs objected to discovery of IDOC telephone calls, Defendants limited the request to call logs for, among others, two more test case Plaintiffs: Clifford Roberts and Lionel White, Sr.  (Doc. 668-2, at 4).  The subpoena also requested a PAN (Personal Allowed Number) List for the calls involving Coleman, Carter, and Delaney.  (Id.).[2]  Defendants say they focused on call logs so "they could narrow the subpoenas to those calls most likely to contain relevant information."  (Doc. 668, at 14). In responding to the subpoena, IDOC inadvertently produced both the logs and 872

---

[1]    The nine test Plaintiffs addressed in the motion are: Bobby Coleman (19 C 1094), Milton Delaney (19 C 1083), William Carter (17 C 7241), Clifford Roberts (22 C 674), Lionel White, Sr. (17 C 2877), Andre McNairy (18 C 5127), Allen Jackson (18 C 5121), Henry Thomas (18 C 5131), and Phillip Thomas (18 C 5132).  While the subpoenas to IDOC were issued under the Watts Consolidated case number (19 C 1717), the rider for each subpoena identifies the plaintiff for whom recordings are sought and the case number of that plaintiff's federal lawsuit. (See e.g., Doc. 668-1).

[2]    A PAN List identifies, among other things, the name of the person called and his or her relationship to the Plaintiff.  (Doc. 668, at 6 n.4).

phone calls for Roberts and White. Plaintiffs objected and Defendants once again agreed not to review the calls at that time, and turned them over to Plaintiffs without retaining a copy.

## C.     The October 23, 2023 Subpoena

On October 23, 2023, Defendants issued a third subpoena to IDOC seeking call logs for 21 Plaintiffs, including 17 test case Plaintiffs, nine of whom have calls at issue in this motion. (Doc. 668-3). During a meet and confer the next day, Defendants indicated that they wanted to discuss the individuals identified on the logs and issue subpoenas for some of the underlying phone calls. Plaintiffs stated that they would move to quash any such subpoena. IDOC produced the call logs to Defendants on November 5, 2023. (Doc. 668-4). Defendants asked Plaintiffs to identify the unknown callers on the logs so they could "determine if [the individuals] were occurrence witnesses, damages witnesses, or totally unrelated to these proceedings." (Doc. 668, at 6). Plaintiffs declined to provide the information and reiterated that they would move to quash any subpoena for the calls. (*Id.*).

## D.     The December 12, 2023 Subpoenas

On December 8, 2023, Defendants sent a letter notifying Plaintiffs that they intended to issue subpoenas to IDOC for some but not all recorded phone calls for four test case Plaintiffs: Allen Jackson, Henry Thomas, Phillip Thomas, and Andre McNairy. (Doc. 649-1). Defendants also asked to review 874 of the 1,374 phone calls already in the parties' possession made by Carter, Coleman, Delaney, Roberts, and White. Many of those calls were to frequently dialed numbers for which Defendants did not have complete identifying information. (Doc. 649, at 2). Plaintiffs objected that the requested

discovery was untimely and irrelevant, and that they had no obligation to provide the identities of the unknown persons who were called. (Doc. 668, at 8).

Shortly thereafter, on December 12, 2023, Defendants issued subpoenas to IDOC for 287 phone calls made by McNairy, Jackson, Henry Thomas, and Phillip Thomas. The return date for each was December 18, 2023, the day when fact discovery closed in the test cases (except for certain depositions) (Doc. 658). The parties met and conferred but could not reach agreement about the new subpoenas or whether Defendants should be permitted to listen to the already-produced recorded calls identified by Defendants. To resolve the dispute, Defendants suggested that Plaintiffs "file your motion to quash subpoenas and we file our motion to compel within 14 days, by 12/26." (Doc. 677-2, at 2, Email from J. Marx to T. Kleinhaus dated 12/12/2023). The parties subsequently agreed that Plaintiffs would address all the IDOC calls in one motion to avoid duplicative briefing, leading Plaintiffs to file the pending motion to quash on January 5, 2024.

## DISCUSSION

In their motion, Plaintiffs seek to quash the four IDOC subpoenas that were issued on December 12, 2023, and to preclude Defendants from listening to any of the phone recordings already in the parties' possession from earlier subpoenas. (Doc. 649).

### I.    Mootness

The dispute as to recorded calls for three of the Plaintiffs requested in the December 12, 2023 subpoenas is now moot. After briefing the motion to quash, the parties learned that IDOC was unable to produce any of the 164 requested recordings for Allen Jackson (18 C 5121), Henry Thomas (18 C 5131) and Phillip Thomas (18 C 5132). (Doc. 756). The motion to quash is thus denied as moot as to these recordings.

## II.    Standing

As for the six test plaintiffs whose recorded calls remain at issue, the Court first addresses Defendants' argument that Plaintiffs lack standing to object to discovery of these IDOC calls.   The Court disagrees.   A party has standing to challenge a subpoena "issued by another party to the litigation and directed to a non-party" if "the movant has a claim of privilege attached to the information sought or the subpoena implicates the movant's privacy interests."   *Simon v. Nw. Univ.*, No. 15 C 1433, 2017 WL 66818, at *2 (N.D. Ill. Jan. 6, 2017) (citing *Hard Drive Prods. v. Does 1-48*, No. 11 C 9062, 2012 WL 2196038, at *3 (N.D. Ill. June 14, 2012)).   *See also U.S. v. Raineri*, 670 F.2d 702, 712 (7th Cir. 1982) ("A party has standing to move to quash a subpoena addressed to another if the subpoena infringes upon the movant's legitimate interests."); *Allstate Ins. Co. v. Electrolux Home Prods., Inc.*, No. 16 C 4161, 2017 WL 5478297, at *3 (N.D. Ill. Nov. 15, 2017) (an example of a movant's legitimate interest is production of private information in possession of a third party).

Numerous courts in this district have found that prisoners have a sufficient privacy interest in their recorded telephone calls to support standing.   *DeLeon-Reyes v. Guevara*, No. 18 C 1028, 2020 WL 7059444, at *2 (N.D. Ill. Dec. 2, 2020); *Bishop v. White*, No. 16 C 6040, 2020 WL 6149567, at *3 (N.D. Ill. Oct. 20, 2020); *Russell v. City of Chicago*, No. 20 C 1163, 2022 WL 294765, at *1 (N.D. Ill. Feb. 1, 2022); *Simon*, 2017 WL 66818, at *2; *Coleman v. City of Peoria*, No. 15 C 1100, 2016 WL 3974005, at *3 (C.D. Ill. July 22, 2016); *Pursley v. City of Rockford*, No. 18 C 50040, 2020 WL 1433827 at *2 (N.D. Ill. Mar. 24, 2020).   Defendants apparently disagree with this weight of authority but do not cite

any cases where a court denied a motion to quash a subpoena for IDOC calls based on the incarcerated person's lack of standing.

This Court finds that Plaintiffs' privacy interest in their IDOC phone calls, while minimal, is sufficient to provide standing here. Though prisoners generally know their calls are being recorded, giving them a lesser expectation of privacy, "that does not mean [the] privacy interest in the phone calls is zero." *DeLeon-Reyes*, 2020 WL 7059444, at *2; *see also Coleman*, 2016 WL 3974005, at *3 ("Prisoners would reasonably expect the access to recordings of their telephone calls to be limited to prison officials, law enforcement officials, and other public officers with a bona fide need for such access. Prisoners would reasonably expect that their conversations would not be handed over to civil litigants"); *Bishop*, 2020 WL 6149567, at *4 ("Even if Plaintiff could have expected that his telephone calls would be monitored by prison officials, he would not necessarily have expected that recordings of those calls would be handed over in bulk to an adverse party in a civil case.").

## III.   Timeliness

Turning to another preliminary issue, the parties disagree as to the timeliness (or lack thereof) of the discovery sought by Defendants, and the filing by Plaintiffs of the motion to quash. It is unfortunate that the parties did not seek an earlier resolution of this long-simmering dispute. Each side blames the other for the delay. Defendants observe that Plaintiffs "had been continuing to object but not taking court action" and so argue that they waived any objections. (Doc. 668, at 10). Plaintiffs respond that in light of Defendants' inaction after agreeing not to listen to the calls, they "presumed Defendants had abandoned their pursuit of the IDOC calls," and now it is too late to pursue such

burdensome discovery. (Doc. 677, at 1). On the record before it, the Court is not persuaded that either side has demonstrated a sufficient basis to allow (or deny) the discovery based on the delay and procedural history.

## IV. Analysis

### A. Overview of Arguments

Plaintiffs assert that their motion to quash should be granted because Defendants are seeking information that violates Plaintiffs' privacy where the claim of relevancy is based on mere speculation that any recorded call will contain a discussion relating to liability or damages issues. Plaintiffs also object that the discovery (nearly 1,000 recordings) is disproportionate to the needs of the case, imposing an undue burden given the time and resources that would be diverted to the task of listening to the calls. This burden, they argue, is not outweighed by the "theoretical relevance" of the calls at this late stage of the litigation. (Doc. 677, at 12-13).

Defendants strongly disagree. They emphasize that the calls they seek to review for each of the test Plaintiffs (now six) have been narrowed to only calls with individuals who have relevant information about Plaintiffs' "damages and/or knowledge about the underlying facts giving rise to their lawsuits." (Doc. 668, at 4). Many of these individuals have been disclosed by Plaintiffs as witnesses on these topics. (*Id.* at 4, 15). Defendants also argue that that Plaintiffs' privacy interest is limited, and they are entitled to the discovery at issue to defend themselves against the substantial damages at stake. (*Id.*).

### B. Legal Standard

Under Rule 45(d), a court must, on timely motion, quash or modify a subpoena that "requires disclosure of privileged or other protected matters, if no exception or waiver

7

applies," or "subjects a person to undue burden." FED. R. CIV. P. 45(d)(3)(A)(iii)-(iv). In assessing whether a subpoena imposes an undue burden, courts consider whether "the burden of compliance with it would exceed the benefit of production of the material sought by it." *Nw. Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 927 (7th Cir. 2004); *Bishop*, 2020 WL 6149567, at *4. Where, as here, the subpoenas are issued to a third-party (IDOC) but implicate the privacy interests of the plaintiffs, the Court must consider the "privacy burden" on plaintiffs and balance their privacy interests in the subpoenaed materials against the relevance and benefit of those materials. *Rodriguez v. City of Chicago*, No. 18 C 7951, 2021 WL 2206164, at *2 (N.D. Ill. June 1, 2021)*, Bishop*, 2020 WL 6149567, at *4 (citing *Simon*, 2017 WL 66818, at *2; *Coleman*, 2016 WL 3974005, at *3).

Rule 26 also allows a court, for good cause, to enter an order to protect a party or person from undue burden. FED. R. CIV. P. 26(c). In addition, "the relevance and proportionality limits in Rule 26 . . . apply with equal force to nonparty discovery under Rule 45." *DeLeon-Reyes v. Guevara*, No. 18 C 1028, 2020 WL 3050230, at *3 (N.D. Ill. June 8, 2020); See 9A Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Civ.* § 2459, at 26-27 (3d. ed.) (the scope of production under a subpoena is coextensive with the limitations of scope prescribed in Rule 26(b)(1)). Under Rule 26(b)(1), parties "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering [among other factors] whether the burden or expense of the proposed discovery outweighs its likely benefit" and "the importance of the discovery in resolving the issues."

In summary, in resolving Plaintiff's motion, the Court must determine whether the IDOC calls are relevant and if so, whether the burden of discovery of the calls (that is, the

privacy burden from the intrusion on Plaintiffs' privacy, plus the burden entailed in reviewing all the calls) outweighs the likely benefit of the calls considering their importance (or lack thereof) in resolving issues in the litigation. As with any discovery matter, the Court has wide discretion in resolving this dispute. *See, e.g., Geiger v. Aetna Life Ins. Co.*, 845 F.3d 357, 365 (7th Cir. 2017) ("Trial courts retain broad discretion to limit and manage discovery under Rule 26 of the civil rules.") (internal quotations and brackets omitted).

### C. Weighing Burden and Benefit

While the inquiry into whether the burden of discovery of IDOC recordings outweighs the benefits in a particular case is fact intensive, the Court's analysis is guided by certain general principles, as well as by past decisions of courts in this district analyzing similar issues.

### 1. Burden of Discovery

As noted, an incarcerated person's privacy interest in recordings of their phone calls from prison is reduced but not non-existent. *Velez v. City of Chicago*, No. 18 C 8144, 2021 WL 3231726, at *3 (N.D. Ill. July 29, 2021) (plaintiff knew, or should have known, that his calls were being monitored or recorded, so "his claimed privacy interest is . . . greatly minimized."); *Bishop*, 2020 WL 6149567, at *4 ("Plaintiff is entitled to some degree of privacy in the personal content of those conversations, even though he knew others could listen to, and record, those conversations because he was in jail."). All six of the plaintiffs for whom recordings are now sought were incarcerated when the recordings were made, so all have the same minimal privacy interest in the recordings of their calls.

This does not mean the burden on each plaintiff from discovery of his recorded calls is the same.  This is because the number of recordings sought for each plaintiff varies.  For example, Defendants seek to listen to 498 recorded calls of Plaintiff Roberts but only 10 recorded calls of Plaintiff Coleman.  The intrusion on privacy (i.e., the privacy burden) from Defendants listening to 498 calls is greater than the burden from their listening to 10 calls.  In addition, a larger volume of calls leads to a greater burden due to the time and expense required to review them.  Plaintiffs argue there would be a "serious burden" from discovery of all the calls sought by the subpoenas since counsel "will have to listen to each one to assess any marginal relevance and whether Defendants may attempt to use it to build their case."  Plaintiffs' counsel observe from experience that "deciphering recorded calls is particularly laborious because the recordings are often of poor quality and must be listened to multiple times to discern necessary context and meaning."  (Doc. 649, at 10).  Hence, "[d]ownloading, organizing, and listening to a large number of IDOC calls is incredibly time-consuming, likely taking hundreds to thousands of hours."  (*Id.* at 9).

The Court declines to weigh the burden of reviewing the recorded calls for the six plaintiffs in the aggregate.  Instead both the burden and benefit from the discovery will be assessed separately for each plaintiff based on the facts presented in each plaintiff's case (e.g., the number of recordings, the relationship of the plaintiff to the individuals called, and the strength of other evidence supporting relevancy).  That said, the Court agrees that there is a burden imposed on each plaintiff from the need of his counsel to divert time and resources to review the calls, and so considers this as part of its analysis.  Defendants' suggestion that Plaintiffs can avoid this burden by opting not to listen to calls

rings hollow given counsel's obligations to their clients. *See McClendon v. City of Chicago*, 345 F.R.D. 322, 327 (N.D. Ill. 2024) (granting motion to quash subpoena and noting that "Plaintiff's counsel understands his obligation to review all discovery materials, which could require not only listening to the calls, but likely transcribing, abstracting, or otherwise organizing the information. This burden, while not overwhelming, is more than enough to outweigh the theoretical relevance of the calls.").

### 2. Benefit of Discovery

Even when the number of IDOC recordings sought for a plaintiff is small, and so the burden minimal, there is no entitlement to discovery of recordings absent a showing of relevance. *See* FED. R. CIV. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case"); *Rodriguez*, 2021 WL 2206164, at *2 (granting motion to quash a single recorded call with witness Soto since the expected discussion was not relevant). The challenge with discovery of IDOC recordings is that a party cannot as a practical matter specify in a subpoena that IDOC identify and produce only the ones that contain relevant content (e.g., recordings discussing the circumstances of the alleged wrongful conviction, or the impact of the incarceration). *Coleman*, 2016 WL 3974005, at *4 ("The relevant calls cannot be identified without listening to the recordings."). Given this, defendants at times have issued subpoenas to IDOC seeking *all* recorded calls for a plaintiff in order to listen to each call and identify which ones (if any) are relevant.[3]

---

[3]     In *Coleman,* the plaintiffs suggested that their counsel listen to the calls in the first instance and then produce only the relevant ones. The court declined this proposal, observing that it "will only result in additional discovery litigation and delay" as the review "will take time" and defendants "will invariably dispute whether additional calls should be produced." 2016 WL 3974005, at *5.

Multiple courts in this district have disallowed such blanket subpoenas as they seek extremely broad discovery that would significantly intrude on the incarcerated person's privacy interest based on the mere assertion that relevant information *may* be found within some unknown number of recordings from among hundreds or even thousands to be produced. *See Simon*, 2017 WL 66818, at *4 (subpoena for 15 years of phone call recordings the plaintiff made to family members, friends, and other third parties was a "broad fishing expedition" akin to "throwing darts in the dark."); *Bishop*, 2020 WL 6149567 (quashing subpoena for all 8,000 recorded calls as "the bare assertion that the material sought *may* contain relevant information is insufficient to allow an unlimited subpoena."); *Pursley*, 2020 WL 1433827, at *5 (quashing subpoena for 3,000 recorded telephone calls from 2013 – 2017 based on assertion that they "may" contain relevant information); *DeLeon-Reyes*, 2020 WL 7059444 (quashing subpoena for all of the plaintiff's IDOC telephone calls from "2019 to present.").

At the same time, courts have recognized that a party need not identify the specific IDOC recordings containing relevant content in order to issue a subpoena for recordings. *See Pursley*, 2020 WL 1433827, at *4 (declining to require the defendants to identify "specific recordings or dates."); *Simon*, 2017 WL 66818, at *4 (defendants cannot be expected to issue subpoenas "identify[ing] specific calls with specific details as to why the call would be discoverable," as this would "turn the discovery process on its head.").

Instead, courts in this district have permitted discovery of IDOC recordings where evidence already in hand is sufficient to show that certain recordings (e.g., with particular persons and/or during specific time periods) "probably" contain relevant information *and* the subpoenas are narrowly tailored to seek only that subset of recordings. *Rodriguez,*

12

2021 WL 2206164, at *2 (quoting *DeLeon-Reyes*, 2020 WL 705944, at *5) ("Taken together, *Coleman*, *Simon*, and *Bishop* teach that in order to overcome a prisoner's privacy interest in the recordings of her telephone calls, the subpoenaing party must offer more than mere speculation that the recordings could house relevant evidence. Put another way, there must be evidence already discovered indicating that the recordings would probably document something relevant.").[4] When this showing is made, "[t]he fact that the recordings may include some incidental and irrelevant information does not support quashing the subpoena." *Velez*, 2021 WL 3231726, at *2; *Pursley v. City of Rockford*, No. 18 C 50040, 2020 WL 7260797, at *3 (N.D. Ill. Dec. 10, 2020) ("*Pursley II*").

Even when recordings probably contain relevant information, discovery of them is not automatic. Under Rule 26, discovery must be proportional to the needs of the case considering (among other factors) the importance of the information sought to the issues in the case and whether the burden outweighs the likely benefit. FED. R. CIV. P. 26(b)(1). *See also Bishop*, 2020 WL 6149567, at *7 (the question "is not only whether a broad search of Plaintiff's calls would possibly uncover relevant information, but also whether such a search is proportional to the needs of the case."); *Pursley II*, 2020 WL 7260797, at *4 ("Having found that the requested recordings are relevant, the Court next must balance the burden of compliance on Plaintiff's privacy interests against the benefit of production of the material sought.").

---

[4]     For example, in *Rodriguez,* the court allowed discovery targeted to IDOC recordings with certain family members where other evidence indicated "the recordings would probably contain relevant information," since this "differentiates this case from the blanket review of all phone calls that were rejected in *Simon* and *Bishop.*" 2021 WL 2206164, at *2.

In the cases at hand, Defendants primarily argue that the recordings are likely to provide relevant information about Plaintiffs' claimed emotional distress from their wrongful convictions and resulting incarceration. (Doc. 668, at 14-15). This is so, they reason, because the calls were to family members and others who Plaintiffs have disclosed as damages witnesses. (*Id.* at 15). As for the importance of this discovery, Defendants observe that "[a]s Plaintiffs have put the effects of their incarceration at issue in this lawsuit, Defendants should be allowed to hear what Plaintiffs had to say regarding their life in prison, while Plaintiffs were living in prison." (*Id.*). They further describe these calls as the "best evidence" of the effects of the incarceration since "many [of] the IDOC phone calls contain contemporaneous discussions between Plaintiffs and disclosed damages witnesses…." (*Id.*). They finally argue that this discovery is "proportional to the needs of these nine cases" because of the "extreme importance of the issues at stake" to both sides, and the "significant damages" claimed by Plaintiffs. (*Id.*). Defendants are less clear about how the discovery would bear on these issues, remarking only that they "have a very different version of what occurred" from Plaintiffs, and the calls "are needed to ascertain whether in fact Plaintiffs were falsely arrested and convicted, and if so, the extent to which they suffered damages." (*Id.*).

Plaintiffs, on the other hand, argue that Defendants have not cited deposition testimony or discovery answers demonstrating that Plaintiffs "talked about the relevant events with their family or friends while incarcerated during the requested time periods." (Doc. 677, at 8). Notably, they point out that in some of the subpoenas, "Defendants requested calls that were made during incarcerations completely unrelated to the false arrests and wrongful convictions at issue here." (*Id.*). And some of these calls did not

14

occur until several years after the incarcerations for the Watts-related convictions.  (*Id.* at 9).  Plaintiffs reason that when calls to family are made "years after the incident at issue" and "during an incarceration from charges that did not stem from Defendant Watts and his team's false arrest," it is particularly speculative to suggest the discussions were probably about the Watts case. (Doc. 677, at 9).

Elsewhere Plaintiffs in essence quarrel with the weight and probative value of the recordings, stating that "[g]iven the gravity of wrongful incarceration, it is difficult to imagine anything a plaintiff could say on a phone call to diminish that harm." (*Id.* at 10).[5] The Court declines to broadly declare all recorded calls that bear to some degree on a plaintiff's emotional distress and other damages from incarceration to be non-discoverable.  The closer question is whether discovery of such calls is proportional where the number of recordings is large, and the probable content of some unknown number of them is relevant but of marginal, questionable or uncertain benefit.

As discussed below, to avoid disproportional discovery sought from certain of the six test case plaintiffs, the Court has opted at times to reduce the number of recordings that Defendants may review.

### D. Six Test Cases

With this backdrop, the Court now examines the facts specific to each of the six plaintiffs and rules on whether Defendants may listen to all, some, or none of the recorded calls made by each plaintiff.

---

[5]      Plaintiffs note that during a meet-and-confer session, Defendants reportedly offered the following hypothetical scenario where they felt a plaintiff's calls would be probative and undermine a damages claim: a plaintiff claims that "being incarcerated harmed his relationship with his mother, yet he talked to her on the phone every day."  (Doc. 677, at 9).

### 1.    Andre McNairy, 18 C 5127

Andre McNairy alleges that the Watts team falsely arrested him in September 2008.  He was convicted following a bench trial and incarcerated from April 30, 2010 to March 7, 2013.  (Doc. 677-6, A. McNairy Offender Custody History).  Based on their review of a call log, Defendants issued a December 12, 2023 subpoena to IDOC seeking 123 calls that McNairy made from May 5, 2017 to July 6, 2018 during a later unrelated incarceration.  Forty-five of the calls were to McNairy's sister, Tina Patterson.  (Doc. 668, at 18).  McNairy testified at his June 23, 2022 deposition that he was living with Patterson at the time of his September 2008 arrest in the Watts case.  (Doc. 668-28, McNairy Dep., at 42).  McNairy also identified Patterson in his interrogatory answers as one of five people who "have knowledge of the facts that relate to, at a minimum, Plaintiff's individual claims." (Doc. 668-27, A. McNairy Interrogatory Answers, at 2-3).  Based on this, Defendants argue "it is highly likely these [45] calls contain relevant evidence."  (Doc. 668, at 18).

The remaining 78 calls were to Danielle Barnett, McNairy's friend who he testified was included on his IDOC visitor's list.  (*Id.*; Doc. 668-28, McNairy Dep., at 88). Defendants note that McNairy called Barnett (who has not been identified as a witness in the case) "nearly twice as much as his sister," and so they believe the two "likely" had a close relationship and thus "would have discussed the impact the incarceration was having on his life, and his belief that he was framed."  (Doc. 668, at 18).

Though these 123 calls (from May 5, 2017 to July 6, 2018) took place years after McNairy's incarceration for the Watts-related conviction (ending in March 2013), the calls are in the same time period when his petition for relief from judgment in the Watts case was prepared and filed (September 2017), and when the conviction was vacated

16

(November 2017). (No. 18 C 5127, Doc. 1 ¶¶ 93, 94). And the latest calls occurred within a few weeks of the July 27, 2018 filing of McNairy's civil rights lawsuit against Watts and other defendants. Given this, the Court is persuaded that it is probable that in at least some of the numerous phone calls McNairy had with his sister and friend, he discussed his allegations of false arrest and wrongful incarceration at the hands of Watts and his team, and the consequences.

This does not end the analysis as the discovery must also be proportional to the needs of the case. It seems quite possible that many of the 123 calls will contain no relevant content, and the probative value of even relevant calls is uncertain, particularly to the extent there is discussion about life in prison so many years after the incarceration at issue. What is not subject to question is the burden of the discovery. Were the Court to allow Defendants to listen to the 123 calls, this not only would intrude on McNairy's minimal privacy interest, but would require his attorneys to divert time and resources to the task of listening to the recordings -- not to mention transcribing, abstracting, or otherwise organizing the information from any calls containing arguably relevant content. This is not a minimal burden at this late juncture of the case given the volume of work that remains to be done in short order in the 19 test cases.

Under these circumstances, the Court finds that the burden of discovery of all 123 calls outweighs the likely benefit, so is not proportional to the needs of the case. Defendants will, however, be allowed to select 37 calls to review.[6] Plaintiffs' motion to quash as to McNairy's calls is granted in part and denied in part.

---

[6]     If the calls that the Court is allowing Defendants to review in this and other cases turn out to be highly probative on issues of importance in the case, Defendants may request the Court to re-assess the burden versus benefit of the group of recordings and allow more calls to be examined.

### 2. Clifford Roberts, 22 C 674

Clifford Roberts alleges he was wrongfully arrested by the Watts team on drug charges in January 2003, and sentenced to four years' incarceration pursuant to a plea deal. (No. 22 C 674, Doc. 1, Cmplt. ¶¶ 44, 45). Roberts was imprisoned on the conviction from October 14, 2003 to March 26, 2004 when he was released on parole. (Doc. 677-5, C. Roberts IDOC Offender Custody History). Defendants seek to listen to 498 calls that he made to his relatives from March 8, 2013 to May 25, 2023 while imprisoned for unrelated crimes.[7]

Of the 498 calls, Roberts made 170 of them to his mother Avis (a/k/a Ades) Roberts, who he has identified as a person he was living with in Ida B. Wells at the time of his January 2003 arrest and who "may have knowledge of Plaintiff's damages, as well as certain Defendants' misconduct." (Doc. 668-20, Loevy Test-Case Plaintiffs' Supplemental Disclosures, at 7). Roberts placed 114 calls to his brother Darnell Poston, who he identified as a witness who "may have knowledge concerning Plaintiff's damages." (Id.). An additional 75 calls were to his other brother, Joseph Roberts, who has not been identified as a witness in the case. The last 139 calls were to Robert's sister Ava D. Poston, a person who "may be able to testify to Plaintiff's damages." (Id.).

Since relatives Avis, Darnell and Ava were identified by Roberts as potential damages witnesses, they likely have knowledge of Roberts' damages from discussions with him. But the question is whether the calls at issue probably contain those discussions. Given that these calls occurred between nine and nineteen years after Roberts' incarceration in the Watts-related case (while incarcerated for unrelated

---

[7] IDOC inadvertently produced these calls in response to Defendants' May 16, 2023 subpoena for call logs, and the recordings are now in the possession of Roberts' attorneys.

offenses), the Court is not persuaded that the calls between 2013 and 2023 are probably relevant to his damages from the incarceration in 2003 and 2004. To the extent that he spoke about how he was experiencing life in prison at the time of the calls, the probative value (if any) would be negligible. Not only was Roberts much older by then and not serving his very first incarceration as he was following the Watts conviction, but he likely was in a different facility and certainly was interacting with different guards and prisoners. In addition, the phone calls would not rebut Roberts' key and undeniable allegations that he lost his freedom while incarcerated and the opportunity to interact with his loved ones - including his child. (No. 22 C 674, Doc. 1, Cmplt. ¶ 110; Doc. 668-15, at 1-2). *See Pursley*, 2020 WL 1433827, at *3 (observing that even if subpoena "were limited to calls with family members," defendants "do not explain how conversations with family members could rebut the allegation that Plaintiff was deprived of watching his young children grow up or that he was separated from his family during his incarceration[,]" as "[t]hese allegations are facts that no conversation could rebut.").

Defendants argue that conversations with mother Avis and brother Joseph between March 2013 and May 2023 are still relevant for a different reason: they are likely to reveal details about the alleged false arrest of Roberts and Defendants' misconduct. (Doc. 668, at 19). In support, they note that both Avis and Joseph prepared affidavits "alleging misconduct by Sgt. Watts and other Defendant Officers." (Doc. 668, at 19). Avis signed an affidavit on August 24, 2018 in connection with a criminal case against her son Joseph. (Doc. 668-31, A. Roberts Aff.).[8] Joseph signed an affidavit on February 12,

---

[8]     Specifically, Avis attested that on April 1, 2001 (about two years before Roberts' arrest by the Watts team), "several men, who I later learned were Chicago Police Officers, pushed their way into my apartment," grabbed Joseph and charged him with drug and gun possession even though "[t]o the best of my knowledge, Joseph did not have drugs or guns in my house." (Doc. 668-31, A. Roberts Aff. ¶¶ 1, 5, 6).

19

2018, also in connection with the criminal case against him, asserting that Defendants Watts, Mohammed, and Alvin Jones framed him. (Doc. 668-32, J. Roberts Aff.).

Based on these affidavits, Defendants have shown that Avis and Joseph discussed Watts and other Defendant officers in 2018, at least in relation to their affidavits. Given this, as well as Roberts' familial relationship with Avis and Joseph, the frequency of his calls to them, and the fact that Roberts identified Avis as a potential witness to Defendants' misconduct, the Court finds it is probable that some of the conversations Roberts had with Avis and Joseph, particularly in and around 2018, related to the Watts team and allegations in this case. For similar reasons, it is probable that some of their calls were about Watts and his team in later years that coincided with post-conviction developments in Roberts' Watts-related case: 2017 (motion to vacate conviction was filed); 2021 (receipt of Certificate of Innocence); and 2022 (filing of his civil rights lawsuit). (No. 22 C 674, Doc. 1, Cmplt. ¶¶ 15 and 107).

This showing that the 245 calls (170 calls with Avis and 75 calls with Joseph) house some relevant discussions does not mean the discovery is proportional and the burden is outweighed by the likely benefit. Many of these 245 calls will likely contain no relevant content at all, and the probative value and benefit of even the relevant calls is uncertain. Given this, the Court finds that discovery of all 245 calls is disproportional and the burden of that discovery outweighs the likely benefit. Accordingly, Defendants will be permitted to select only 50 of the 245 calls to review. Plaintiffs' motion to quash as to Roberts' calls is granted in part and denied in part.

### 3.    Lionel White, Sr., 17 C 2877

Lionel White, Sr.'s complaint alleges he was falsely arrested by the Watts team on April 24, 2006, pled guilty to the charges, and was incarcerated from 2006 to 2008.  (No. 17 C 2877, Doc. 1, Cmplt. ¶¶ 15, 23, 33; Doc. 677, at 8).  Defendants want to listen to 36 calls that White made from January 18, 2009 to September 17, 2012 during an unrelated incarceration.  IDOC inadvertently produced these calls in response to Defendants' May 16, 2023 subpoena.  Nine of the recorded calls were with White's girlfriend Kimberly D. Collins.  He lived with her at Ida B. Wells for several years and she is one of 13 individuals that White disclosed as having knowledge of "facts underlying Plaintiff's claims."  (Doc. 668-33, L. White, Sr. Rule 26(a)(1) Disclosures, at 1).

Defendants rely on an affidavit that Collins signed on August 3, 2016 as evidence of relevancy.  That affidavit was made to support White's motion to vacate a conviction stemming from his April 2006 arrest by the Watts team (motion was granted on December 14, 2016).  (Doc. 668-34, K. Collins Decl.; No. 17 C 2877, Doc. 1, Cmplt. ¶ 40).  In the affidavit, Collins attested that there were "many instances" while she was living at Ida B. Wells from 2006 to 2008 (i.e., while White was serving time on the conviction at issue in this lawsuit) when "Sgt. Ronald Watts, Alvin Jones . . ., Kallatt [sic] Mohammed and other police officers came into my home and searched it."  (Doc. 668-34, K. Collins Decl. ¶¶ 1-3).  She further stated that she was "well aware of the reputation of Sgt. Watts and these other officers as dirty and corrupt police."  (*Id.* ¶ 4).  Finally, Collins said that after White was arrested in April 2006, she spoke to him on the phone and he told her that Jones "beat on him and tore up my house."  (*Id.* ¶ 8).

The Court finds that these statements from Collins make it probable that she and White discussed his alleged false arrest and wrongful incarceration at the hands of the Watts team. It is also probable that some of these discussions occurred by phone between January 2009 and September 2012. Not only is this period relatively close in time to when White was released from prison in the Watts-related case (2008), but there were highly publicized stories about the criminal prosecution of Watts and Mohammed in 2012: *See e.g., "Federal authorities have arrested a Chicago Police sergeant and patrol officer and charged them with stealing $5,200 in what they thought was illicit drug money,"* CBS News, (Feb. 13, 2012) (https://www.cbsnews.com/chicago/news/cops-charged-with-stealing-what-they-thought-was-drug-money/), *archived at* http://perma.cc/YVF4-T9SF. Later, in June 2012, Watts and Mohammed appeared in federal court again to be arraigned on federal charges, and two months later (in August 2012) Mohammed pled guilty to federal charges.[9] Since there are only nine recordings of calls between White and Collins, the Court finds the burden of discovery of these relevant calls does not outweigh the benefit and so the discovery is proportional. Plaintiffs' motion to quash as to these calls is therefore denied and Defendants may listen to the recordings.

The remaining 27 calls were made to persons whose names and/or relationships to White are unknown. (Doc. 668, at 20-21). Defendants offer nothing to suggest that White spoke to any of these people about his allegations in this case or his damages. Though the number of calls requested is "relatively small" (*id.* at 21), and so the burden is fairly minimal, Defendants are not entitled to the discovery without demonstrating that

---

[9] See *U.S. v. Ronald Watts,* 12 CR 87, docket entries 1, 5, 9, 27, 33, 34, and 56. The federal criminal proceedings against Watts and Mohammed continued after White's release from prison in September 2012. Specifically, Mohammad was sentenced in October 2012. (Doc. 59). And Watts pled guilty to certain charges in July 2023 (Doc. 79), and was sentenced in October 2023 (Doc. 85, 86).

the recordings probably house relevant evidence. *DeLeon-Reyes*, 2020 WL 7059444, at *5; *Rodriguez*, 2021 WL 2206164, at *2.[10] The motion to quash as to these 27 calls is granted.

### 4. Bobby Coleman, 19 C 1094

Bobby Coleman alleges that he was wrongfully arrested by the Watts team on drug charges on January 4, 2003, and received a four-year sentence following a guilty plea to the charges. (No. 19 C 1094, Doc. 1 ¶¶ 35, 46, 52, 53). He was incarcerated from February 18, 2005 until June 10, 2005 when he was released on parole. (Doc. 677-7, B. Coleman IDOC Custody Offender History). Defendants seek to listen to 10 calls that Coleman placed while incarcerated between July 19, 2011 and September 30, 2011. The parties have been in possession of these recordings since July 2020.

Five of the calls were to Erika Hill, a person Coleman identified as having "knowledge of Plaintiff's damages." (Doc. 668-35, B. Coleman's Rule 26(a)(1) Disclosures, at 4). Defendants argue that this "admission" by Coleman demonstrates that conversations with Hill are relevant. (Doc. 668, at 21). While Coleman likely spoke with Hill at some point about the damages from the wrongful conviction and incarceration since he identified her as a possible damages witness, the Court has no basis to find it probable that these discussions will be found within the five calls with Hill in 2011. Given the passage of time (six years), it seems more likely that they spoke in 2011 about other and more recent events. Defendants only speculate that the five calls contain relevant content about damages.

---

[10]     As for Defendants' assertion that White's daughter or her counsel "may be able to identify" the unknown individuals and explain their relationship to White who is now deceased (Doc. 668, at 20, 21), Defendants should have sought that information before the close of discovery.

As for the other calls, a skip trace reportedly shows that Coleman made four of the calls to Dorothy J. Coleman ("Dorothy"), who Defendants say is Coleman's "relative." (Doc. 668, at 21). Dorothy has not been identified as a witness in the case, but Defendants contend that "given the small number of calls, and the likelihood that a call with a relative would shed light on his damages, Defendants are entitled to review these calls." (*Id.*). The Court disagrees given the lack of evidence indicating it is probable that these four calls in 2011 will be probative of Coleman's damages. Coleman may well have spoken with Dorothy about any number of other topics that one might discuss with a relative.[11]

Finally, Coleman made one call to Leonard Gipson, another Plaintiff in these consolidated proceedings (No. 18 C 5120). Coleman testified at his November 13, 2023 deposition that he and Gipson were friends and equal partners overseeing drug sales for a particular dealer. (Doc. 668-36, Coleman Dep., at 82-83). Gipson denies dealing drugs. (Doc. 668-37, L. Gipson Aff.). Defendants argue that "[g]iven that [Coleman and Gipson] are both plaintiffs in these Watts cases, it is reasonable to believe that they discussed issues relevant to the facts of their cases." (Doc. 668, at 22). While anything is possible, Defendants have not shown it is probable that Coleman and Gipson spoke about the facts of their cases in this particular call in 2011. This is pure speculation.

For all of these reasons, the motion to quash is granted as to all of the Coleman recordings.

---

[11] Defendants' objection that Coleman easily could provide more information about Dorothy is unpersuasive. Defendants have had Coleman's call log since July 2020, and though they deposed him in November 2023, they did not ask about Dorothy or her phone number, or pursue other discovery aimed at assessing her relationship to Coleman. (Doc. 677, at 7). Any request to do so now is untimely.

24

### 5. Milton Delaney, 19 C 1083

Milton Delaney alleges he was falsely arrested by the Watts team on February 22, 2007, and served one year in custody after accepting a plea deal. (No. 19 C 1083, Doc. 1 ¶¶ 34, 41, 45, 46). Defendants seek to listen to 204 calls that Delaney made between December 16, 2008 and March 15, 2011, all of which have been in the parties' possession since July 2020. According to a skip trace, 161 calls were to LaQuita Bonds who Delaney identified at his July 26, 2021 deposition as a girlfriend but who has not been identified as a witness in this case. (Doc. 668-38, Delaney Dep., at 107). Bonds was present at the courthouse during Delaney's trial, may have hired an attorney to defend him, and visited him when he was serving time in prison at the East Moline IDOC facility. She also spoke to him on the phone while he was serving his one-year sentence from the Cook County case (presumably the Watts-related conviction) and his eight-year sentence in a Will County case. (*Id.* at 108, 126-27). Given that Bonds was "aware of [Delaney's] criminal proceedings and [w]as his girlfriend," Defendants say he "likely discussed the effects of his incarceration with her." (Doc. 668, at 22).

It is unclear from the briefing whether any of the 161 calls with Bonds occurred while Delaney was serving his one-year sentence for the Watts-related conviction. The Court agrees that it is probable that the calls with Bonds during that particular incarceration (if any) contain relevant content about the effects of the incarceration. The probative value of such calls, however, is uncertain, as is the burden of the discovery since the number of calls during this period is unknown. Under the circumstances, the Court will allow defendants to review up to 32 calls with Bonds provided they occurred while Delaney was serving his sentence for the Watts-related conviction.

As for the remaining 43 calls that Defendants seek to review, a skip trace shows these were to Arturo Haro, Sr., a person who is not identified as a witness in the case. Defendants do not know Haro's relationship to Delaney but believe from the number of calls that "it is likely they knew each other well." (Doc. 668, at 22).[12] The Court is not persuaded that it is probable these 43 recordings contain relevant information, so the discovery is denied.

Plaintiffs' motion to quash is granted in part and denied in part as to the Delaney recordings.

### 6.    William Carter, 17 C 7241

William Carter alleges that the Watts team falsely arrested him three times between March 2004 and May 2006, leading to his wrongful detention and incarceration. For the May 2006 arrest, he was sentenced to nine years' imprisonment following conviction by a jury, and was released on parole on January 21, 2010. (No. 17 C 7241, Doc. 1 ¶¶ 30, 31, 46, 47, 72, 73). Defendants seek to listen to 126 calls that Carter made over a four-year period between December 23, 2008 and December 7, 2012. All parties have had these recordings since July 2020.

According to a skip trace, 81 of the calls were to Carter's sister, Angela Carter. Defendants argue it is "likely" Carter and his sister discussed his belief that he was framed, and say the conversations "likely show[] the emotional effects of his incarceration." (Doc. 668, at 23). Angela was not identified as a witness in the case on

---

[12]    Defendants also argue that "Delaney should not be able to avoid these calls being reviewed by declining to provide Haro's relationship to him." (Doc. 668, at 22). It is too late for Defendants to request this information now. Defendants could have asked Delaney about Haro at his deposition, but they asked only whether the phone number associated with Haro was "familiar" to Delaney, and he testified that it was not and he is "not good at remembering numbers." (Doc. 668-38, Delaney Dep., at 127-28).

damages or any other topic. Still, given the familial relationship, the large number of calls, and the fact that Carter was still serving time for the Watts-related conviction when most of the calls occurred, the Court finds it probable that in some of the calls between Carter and his sister, they discussed his emotional state while incarcerated. This finding is bolstered by the fact that in 2012, Watts and Mohammed were charged in a highly-publicized federal criminal case, and Mohammed pled guilty and was sentenced in the case. *See supra* at 22. This makes it more likely that the Watts-related conviction and incarceration was the subject of discussion by Carter and his sister in that year.

A skip trace shows the remaining 45 calls were to Janine Maxwell, Carter's mother. (Doc. 668, at 23). Maxwell has not been identified as a witness in this case but Carter testified at his August 23, 2022 deposition that he had a phone call with his mother in which she said she was visiting his "auntie" at the Ida B. Wells complex when Watts and other officers rounded up people and questioned her about drugs (she knew nothing), and an officer slammed her into the crease of an elevator, leading to a back injury that required surgery.[13] Defendants argue that "if Carter believed he was wrongfully convicted by Watts, leading to his incarceration, it is very likely that he would have discussed that with Ms. Maxwell." (Doc. 668, at 23). Given the mother's negative encounter with Watts and his team, and the publicized federal prosecution of Watts and Mohammed in 2012, the Court finds it probable that in some of the recorded calls between Carter and his mother, Carter shared information about the allegations in this case.

---

[13] It appears from Carter's deposition testimony that he may have had this conversation with his mother when he was "in boot camp." (Doc. 668-39, W. Carter Dep., at 154). His mother reportedly said Watts and other officers "came over there, round up people, grabbed her, and was asking her something about who she was working for, something about some drugs or something. And she wasn't cooperating with them because, of course, she don't have any knowledge, and some officer slammed her back, like, to the crease of the elevator, whatever. She had to have like a 30-something-thousand-dollar operation for it." She also "cussed Watts out" at the time. (*Id.* at 154-56).

The question remains whether the discovery of 126 recorded calls is proportional given the intrusion on Carter's privacy and the burden of deciphering the calls. Many of the calls are likely to be irrelevant, and the probative value of the relevant calls is uncertain. In the Court's view, the burden of discovery of all 126 calls outweighs the likely benefit. Defendants may, however, select up to 16 of the calls with Carter's sister, and 10 calls with his mother to review. Plaintiffs' motion to quash as to William Carter's calls is granted in part and denied in part.

### 7.     Summary

In summary, the motion is denied as moot as to the unavailable IDOC calls of Allen Jackson (18 C 5121), Henry Thomas (18 C 5131) and Phillip Thomas (18 C 5132). The motion is granted as to the IDOC calls of Bobby Coleman (19 C 1094) so Defendants may not review any of those recordings. The motion is granted in part and denied in part as to the remaining Plaintiffs, as follows: Defendants may review: 37 of the calls Andre McNairy (18 C 5127) made to Tina Patterson and Danielle Barnett; 50 of the calls Clifford Roberts (22 C 674) made to Avis/Ades Roberts and Joseph Roberts; the 9 calls Lionel White (17 C 2877) made to Kimberly Collins; up to 32 of the calls Milton Delaney (19 C 1083) made to LaQuita Bonds provided they occurred while Delaney was serving his sentence for the Watts-related conviction; and up to 16 of the calls William Carter (17 C 7241) made to Angela Carter, and 10 of the calls he made to Janine Maxwell.

### **CONCLUSION**

For the reasons stated above, Plaintiffs' Motion to Quash Subpoenas to Illinois Department of Corrections for Plaintiffs' Phone Calls [649] is granted in part and denied in part.

ENTER:

Dated: July 19, 2024

SHEILA FINNEGAN
United States Magistrate Judge