**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| In re: WATTS COORDINATED | ) | **Master Docket Case No. 19 C 1717** |
| PRETRIAL PROCEEDINGS, | ) | |
| | ) | **Judge Franklin U. Valderrama** |
| | ) | **Magistrate Judge Sheila Finnegan** |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Currently before the Court is the motion of third-party respondent Cook County State's Attorney's Office (CCSAO) to quash subpoenas for depositions of Eric Sussman, Joseph Magats, Mark Rotert and Nancy Adduci (Doc. 534). The CCSAO moves to quash the subpoenas under the apex doctrine, and on the grounds that the testimony of these witnesses is protected by the deliberative process privilege, mental process privilege, and work-product doctrine. If testimony is to be allowed, the CCSAO asks in the alternative for a protective order limiting the number of depositions and topics. Defendants oppose the motion (Doc. 567).[1] For reasons discussed below, the motion is granted in part and denied in part.

<u>**BACKGROUND**</u>

Following a long investigation led by the FBI, the United States charged Ronald Watts and Kallat Mohammed (then Chicago Police Officers) in 2012 with one count of theft of government funds after stealing drug proceeds from an FBI cooperating witness. Both eventually pleaded guilty, and Mohammed's plea agreement stipulated that he, along with Watts, demanded money from drug dealers working in the Ida B. Wells

---

[1] The opposition brief was filed by counsel for a subset of Defendant Officers who issued the deposition subpoenas that are the subject of the motion. For simplicity, this Opinion refers to their arguments as those of the "Defendants."

Housing Complex in exchange for not arresting them.[2]  Additional scrutiny of Watts' and Mohammed's tactics in various cases followed at the request of those convicted and their lawyers.  Between 2016 and 2022, the CCSAO agreed to vacate over 200 convictions in Watts-related cases and did not oppose court petitions seeking certificates of innocence ("COI").

The estimated 178 persons who were the subjects of the vacated convictions subsequently filed individual federal civil rights lawsuits ("Plaintiffs").  In these lawsuits, Plaintiffs allege that current and former Chicago Police Department officers – led by former Sergeant Watts and, in a majority of cases, former Officer Mohammed – fabricated drug or gun charges against them, leading to false arrests and wrongful convictions in years 2002 through 2008 (the "Watts-related cases").  In addition to Watts and Mohammed, approximately 24 other current and former Chicago police officers have been named as defendants in one or more of these lawsuits.  Plaintiffs have also generally sued the City of Chicago and seven Chicago Police Department supervisory employees.

In 2018, the seven federal lawsuits then pending were coordinated for pretrial proceedings, along with any later-filed cases involving similar claims and the same defendants.  (Doc. 1).  By the end of 2018, there were 23 Watts-related cases in the coordinated proceedings.  New cases were filed in the years that followed: 2019 (37 cases); 2020 (13 cases), 2021 (11 cases), 2022 (89 cases), and 2023 (5 cases).  In early 2023, the parties identified 19 "test cases" to take priority over the other cases, so focused

---

[2]     (No. 12 CR 87, Doc. 153, August 10, 2020 Order, at 2) (citing Information [27]; Mohammed Plea Agreement [43] ¶¶ 1–5, 7; July 19, 2013 Order [79]).  Watts pleaded guilty "blind" without a written agreement with the United States. (July 19, 2013 Order [79]).

their efforts on completing fact and expert discovery and filing Daubert and dispositive motions in those cases. The first of the test cases is set for trial in January 2025.

The subpoenas at issue seek deposition testimony from current and former CCSAO attorneys about the reasons for deciding to vacate the convictions in the Watts-related cases and not oppose petitions for COIs. It is common for such testimony to be sought in wrongful conviction cases asserting malicious prosecution claims, and common for prosecuting agencies to seek to bar this testimony on privilege and other grounds. Indeed, many of the cases discussed in this Opinion that the parties rely on to support their positions involved the very same CCSAO witnesses and issues. What is unusual here and makes the motion more complex is that the focus is not on the CCSAO's decisions surrounding a single conviction on a particular date, but rather decisions surrounding approximately 200 convictions over a span of six years: 2016 to 2022. Not only did the CCSAO decision-makers change over this period, but it appears the process may have changed as well. In addition, at various times over those six years, CCSAO representatives disclosed deliberative information, raising the issue of whether the privilege was waived as to deliberations over all or a subset of the 200 convictions.

To adequately address these issues in the unusual context presented here, and provide guidance in the event of future disputes in Watts-related cases, this Opinion includes extensive factual information.[3]

---

[3]     On September 30, 2024, the Watts coordinated cases are scheduled to be returned to the assigned district judges for completion of pretrial proceedings and trial.

**DISCUSSION**

I.      **The Apex Doctrine**

The subpoenas at issue seek testimony from Eric Sussman, Joseph Magats, Mark Rotert, and Nancy Adduci.  Sussman was the First Assistant State's Attorney ("ASA") from November 2016 through May 2018 when he departed the office.  He appears to have been involved in the decision to vacate a number of Plaintiffs' convictions while in his leadership role.  Magats was a deputy supervisor of the criminal prosecutions bureau, and later the head of that bureau before he succeeded Sussman as First ASA until retiring in November 2020.  Magats was involved in the review of certain convictions vacated prior to November 2017.  Rotert  was  Director of the CCSAO's Convictions Integrity Unit ("CIU") from May 2017 until May 2019.  During that period, he was involved in the CIU's investigative work on Watts-related cases and decisions whether to vacate the convictions, and spoke to the media about those cases.  Finally, Adduci is a current ASA who led the investigations into the Watt-related cases while Rotert was the CIU director.  After he left in May 2019, she became the CIU director and continued her work on the investigations.

In seeking to quash the subpoenas, the CCSAO first argues that Sussman and Magats should not be required to provide deposition testimony on any topic because they are apex witnesses.[4]  Under the apex doctrine, courts protect high-level executive or senior ranking officials from being deposed if: (1) "the official has no unique personal knowledge of the matter in dispute; (2) the information can be garnered from other

---

[4]      The CCSAO originally asserted that Rotert and Adduci also qualified as apex witnesses (Doc. 534, at 4-5), but effectively withdrew this position in the reply brief by failing to respond to Defendants' contrary arguments as to these two witnesses. (Doc. 590, at 3).

4

witnesses; (3) the information can be garnered from other discovery methods; or (4) sitting for the deposition would impose a hardship in light of the officer's other duties." *DeLeon-Reyes v. Guevara*, No. 18 C 1028, 2021 WL 3109662, at *3 (N.D. Ill. July 22, 2021) (citations omitted). As the Seventh Circuit has recognized (without reference to the apex doctrine), "depositions of public officials create unique concerns. 'They should not have to spend their time giving depositions in cases arising out of the performance of their official duties unless there is some reason to believe that the deposition will produce or lead to admissible evidence.'" *Stagman v. Ryan,* 176 F.3d 986, 994-95 (7th Cir. 1999) (quoting *Olivieri v. Rodriguez*, 122 F.3d 406, 409-10 (7th Cir. 1997)). Based on this rationale, the *Stagman* court affirmed the decision to bar the deposition of the Illinois Attorney General where this "would have served little purpose other than to disrupt 'a busy official who should not be taken away from his work to spend hours or days answering lawyers' questions.'" *Id.* at 995 (quoting *Olivieri,* 122 F.3d at 409).

Neither Sussman nor Magats holds a high-ranking position as a public official. While both once held the position of First Assistant State's Attorney, they left the CCSAO years ago. Providing testimony in 2024 will not distract them from high-level public duties, so the Court sees no basis to shield them from depositions on the theory that they are apex witnesses. *See DeLeon-Reyes,* 2021 WL 3109662, at *3 ("[W]hile it is possible that a Rule 30(b)(6) witness could provide some of the same information obtainable from Sussman, he is no longer a CCSAO official, so there is no concern here that sitting for a deposition would impose a hardship in light of Sussman's CCSAO duties."); *Fulton and Coleman v. City of Chicago*, No. 17 C 8696, Doc. 293, and No. 18 C 998, Doc. 249, Transcript of Oral Ruling (N.D. Ill. Dec. 4, 2020) (hereinafter "Fulton Tr.") ("[T]he Court

5

finds that the Apex Doctrine does not bar the testimony of Mr. Sussman and Rotert. Both are no longer at the State's Attorney's Office."); *Almodovar and Negron v. Guevara*, Nos. 18 C 2341, 18 C 2701, Order, at 2 (N.D. Ill. Sept. 20, 2021) (hereinafter "*Almodovar* Order") ("[B]ecause Sussman is no longer employed by the CCSAO, deposing him will not impose a hardship on the CCSAO.").

In asserting that the apex doctrine applies to former officials, the CCSAO relies on *Lee v. City of Chicago*, No. 20 C 1508, Doc. 57, Memorandum Opinion and Order (June 21, 2021), in which the magistrate judge followed the rationale in *U.S. v. Wal-Mart Stores, Inc.*, No. CIV.A. PJM–01–CV–1521, 2002 WL 562301, at *3 (D. Md. Mar. 29, 2002), that former officials should be treated as apex witnesses because not doing so would lead to "indiscriminate" depositions of those former officials and so "likely discourage people from accepting" high positions. *Lee*, Doc. 57, at 11 (quoting *Fed. Deposit Ins. Corp. v. Galan-Alvarez*, No. 1:15-MC-00752 (CRC), 2015 WL 5602342, at *4 (D.D.C. Sept. 4, 2015) which was in turn quoting *Wal-Mart Stores*).[5] Based on these "concerns" and the fact that the resignation of the witness in *Lee* did "not change the fact that she has no unique personal knowledge of the underlying incident or the COPA investigation[,]" the *Lee* court quashed the subpoena. *Id.*

This Court is not persuaded that CEO and high-ranking government jobs will go unfilled due to fear of the burden of post-position depositions, or that this would be a permissible basis for expanding the apex doctrine in any event. Moreover, courts may use Federal Rule of Civil Procedure 45 to protect former high-ranking public officials from

---

[5] The *Wal-Mart Stores* court in turn relied on a West Virginia case that it said "stands for the proposition that former high-ranking officials, like those in active service, should be protected from depositions in the absence of extraordinary circumstances." 2002 WL 562301, at *3 (citing *Arnold Agency v. West Virginia Lottery Com'n,* 206 W.Va. 583, 526 S.E.2d 814 (1999)).

indiscriminate depositions seeking testimony on topics about which they lack personal knowledge. Under that rule, subpoenas to non-parties may be quashed or modified if they "subject[ ] a person to undue burden." FED. R. CIV. P. 45(d)(3)(A)(iv)). In assessing this, courts consider (among other factors) whether the discovery is unreasonably cumulative or duplicative, and whether the information sought is readily obtainable from another, more convenient, less burdensome (but equally reliable) source. *Mosely v. City of Chicago*, 252 F.R.D. 421, 427 (N.D. Ill. 2008) (citing *Northwestern Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 927 (7th Cir. 2004) and other cases).

For these reasons, the motion to quash the subpoenas issued to Sussman and Magats based on the apex doctrine is denied. However, to minimize the burden on these non-parties who are former public officials (including Rotert), the Court grants the CCSAO's request that Defendants be required to depose current CCSAO attorney Adduci before any of the other three witnesses. This makes sense as Defendants acknowledge the depth of ASA Adduci's involvement in the Watts-related cases, so deposing her first undoubtedly will narrow the topics on which testimony of the former CCSAO attorneys is necessary.[6] But it does appear that Sussman, Magats and Rotert have at least some unique personal knowledge on the topics at hand. For example, each has knowledge about his own involvement in decisions to vacate certain convictions, and his own actions and statements, including those to the media. In addition, after Sussman apparently approved the decision to vacate 18 convictions in November 2017, he directed Adduci to

---

[6] Defendants describe Adduci as "the only ASA that has investigated the convictions from the time they went into the [CIU] until the present. ASA Adduci has reviewed materials provided to her by Plaintiff[s'] counsel, has reviewed CCSAO trial files, interviewed police officers, interviewed third-party witnesses, created parameters by which to view and judge cases, made recommendations on cases, and has appeared in Court when convictions were vacated." (Doc. 567, at 23).

compile a list of the officers involved in the arrests leading to those convictions. Magats then used that list to send letters to the Legal Affairs Office of the Chicago Police Department stating that the CCSAO would no longer call these officers as witnesses in pending or future matters "due to concerns about their credibility and alleged involvement in the misconduct of Sergeant Watts." (Doc. 567-4, at 2-3). In their complaints, Plaintiffs include allegations about these letters sent by Magats, and Defendants also believe them to be relevant.[7]

## II. The Deliberative Process Privilege

The CCSAO has also moved to quash the deposition subpoenas on the ground that most of the information sought is protected by the deliberative process privilege. In support, the CCSAO has submitted a declaration from Jessica M. Scheller, Deputy Chief of the Civil Actions Bureau ("the Scheller Declaration"), that broadly invokes the deliberative process and work product privileges "over testimony and materials related to": (1) "decisions made by the CCSAO to drop charges and not to retry Plaintiffs" and (2)

---

[7]     For example, the following allegations appear in the complaint of Plaintiff Willie Martin:

15. In light of the decision of the CCSAO [to vacate the convictions of 15 individuals on November 16, 2017], and recognizing the scope of misconduct that the City let go on for more than a decade unabated, many of the Watts crew were placed on desk duty.

117. The CCSAO will no longer call certain members of Watts's crew as witnesses in any pending or future matters because of their credibility concerns and alleged involvement in misconduct.

118. In November 2017, the Superintendent of the Chicago Police Department, Eddie T. Johnson, placed some of the Defendant Officers named herein, along with other members of Watts's crew, on desk duty pending further investigations into their misconduct.

(No. 19 C 1097, Doc. 1, at 4, 19). Defendants claim that Sussman's decision to request the list in the first place is relevant because it (1) "caused many of the Defendant Officers to be assigned to administrative duties which Plaintiffs may attempt to portray as a form of discipline for having engaged in misconduct," and (2) "led to the Magats Letters, which in turn may have led the CCSAO to agree to vacate additional convictions where it could not call an officer to deny a criminal defendant's allegations." (Doc. 567, at 18).

"the CCSAO's position on the Plaintiffs' petitions for COI."  (Doc. 534-3, Scheller Aff. ¶¶ 7, 8).

Defendants respond that many of their proposed deposition topics seek factual and non-deliberative information not covered by the privilege.  As for topics that *do* seek privileged information, they argue the privilege has been waived based on public statements of CCSAO representatives between 2017 and 2023, as well as disclosures to the Civilian Office of Police Accountability ("COPA") in April 2018.  Finally, even absent a waiver, Defendants contend that they are entitled to the testimony based on a particularized need that outweighs the CCSAO's need for secrecy.  *U.S. v. Farley*, 11 F.3d 1385, 1389 (7th Cir. 1993) (the qualified deliberative process privilege "may be overcome where there is a sufficient showing of a particularized need [for disclosure] to outweigh the reasons for confidentiality.").

This Court first turns to the question of whether the deposition topics identified by Defendants seek testimony protected by the deliberative process privilege.

### A.    Protected Communications

"The deliberative process privilege protects communications that are part of the decision-making process of a governmental agency."  *Farley*, 11 F.3d at 1389 (citing *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 150-51 (1975)).  The privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government."  *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001) (internal quotation and citation omitted).

The Seventh Circuit requires the government to make "a two-fold showing to support the withholding of [information] based on the deliberative process privilege." *Nat'l Immigrant Justice Ctr. v. United States Dep't of Justice*, 953 F.3d 503, 508 (7th Cir. 2020). "First, the [information] must be pre-decisional, meaning that it must be generated *before* the adoption of an agency policy. Second, the [information] in question must [concern] deliberative communications and therefore reflect the give-and-take of the consultative process." *Id.* (internal quotation marks and citations omitted).

In assessing whether testimony on a particular topic qualifies as deliberative, this Court is mindful that the privilege is intended to protect: information that "reflect[s] the personal opinions of the [speaker] rather than the policy of the agency," (*Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 866 (D.C. Cir. 1980)); "internal dialogue" about a proposed rule or decision (*Enviro Tech Int'l, Inc. v. U.S. E.P.A.*, 371 F.3d 370, 375 (7th Cir. 2004)); and "advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Sears*, 421 U.S. at 149. The privilege "typically does not justify the withholding of purely factual material," but does extend to "factual matters inextricably intertwined with" predecisional policy discussions. *DeLeon-Reyes*, 2021 WL 3109662, at *3 (quoting *Enviro Tech Int'l*, 371 F.3d at 375).

## B.    Non-Deliberative Topics

Applying the above guidance, the Court finds that the following topics on Defendants' long and non-exhaustive list do not (at least on their face) seek to learn the

confidential deliberations of the CCSAO, so testimony on them is not shielded by the privilege.[8]

### 1.    Communications with Media and Plaintiffs' Attorneys

Defendants seek to question the witnesses about their communications with third parties such as the media and Plaintiffs' counsel regarding the Watts-related cases. The media statements were publicly reported and many are discussed later in relation to the waiver analysis. The CCSAO identifies no basis to find testimony about a witness's public statements and communications with Plaintiffs' counsel to be protected under the deliberative process privilege. *DeLeon-Reyes*, 2021 WL 3109662, at *3 (finding Sussman can be questioned about public statements); *Fulton* Tr. at 19 (finding statements to the press and "[t]hird party comments…by counsel for plaintiffs" are not subject to privilege since they are "not internal deliberations by the State's Attorney's Office[.]"; *Brown v. City of Chicago*, No. 18 C 7064, Doc. 203, Tr. of Hearing at 32-33 (N.D. Ill. July 30, 2020) (hereinafter "*Brown* Tr.") (Rotert may be asked to confirm statement in his email to Harper's counsel that he did not find Bell's confession to be credible but not asked why he reached this conclusion).

### 2.    Email Correspondence Produced in Discovery

Defendants also seek to question the witnesses about statements they made in their email correspondence. Again, the CCSAO has identified no basis for the Court to declare this information (already disclosed in written form) to be off limits under the deliberative process privilege. That said, the Court cannot predict the precise questions

---

[8]    Claims of privilege generally "must be made and sustained on a question-by question or document-by-document basis[.]" *U.S. v. Lawless*, 709 F.2d 485, 487 (7th Cir. 1983) (citation omitted). But the Court agrees with the parties that it is helpful here to provide rulings and guidance on the privilege issues prior to the depositions to the extent possible.

that will be asked and whether any question will seek information not disclosed in the emails and that would reveal protected deliberations.

### 3. Process/Criteria

Several of the deposition topics fall under the category of the CCSAO's decision-making process over the multiple years when convictions in the Watts-related cases were vacated and petitions for COIs were awarded by the state court:

- The CIU's policies and procedures when investigating claims of innocence

- The investigation conducted and documents reviewed after COI petitions were filed

- The process following a recommendation, including how the individual was notified their convictions would be vacated or their claims were found to be without merit

- The witness's involvement in determining the process and criteria for deciding whether to vacate a case or oppose (or not) a COI petition

- The witness's knowledge of the process and criteria

- Whether the process changed over the time period when decisions in the Watts-related cases were made

- Whether there was a separate process for evaluating petitions for COI versus vacating charges

- What was the recommendation process as to whether to vacate a conviction or oppose (or not) a COI petition

- Who was part of the decision-making process

- Who was present when cases were presented for review of whether to vacate a conviction or oppose a petition for a COI

- Who was the ultimate decision-maker from 2015 to present as to whether to vacate a case or not

On their face, none of these topics seeks testimony about the deliberations of the CCSAO attorneys in making decisions in any Watts-related case as to whether to vacate

12

a conviction and not oppose a petition for a COI. That is, they do not attempt to learn the internal dialogue about a proposed decision, what positions and recommendations were expressed by those involved and any debate that occurred, and what weight was given to each of the various factors considered, or to any particular piece of evidence, and why. Accordingly, the Court finds that questions on these topics are permissible and will not elicit information protected by the deliberative process privilege. *See Fulton* Tr. at 16-18 (questions about general policies and procedures and factors when deciding whether to vacate convictions and oppose petitions for COI, and whether those policies were followed (but without exploring underlying reasons in specific cases) do not invade deliberative process or work product privilege); *Brown* Tr. at 10, 13, 22-23, 30 (allowing questions about CIU policies and procedures and factors taken into account "when investigating claims of innocence; . . . whether those policies were followed and the like.").

The CCSAO initially offered to produce attorney Adduci (until recently, the Director of the CIU), or a Rule 30(b)(6) witness "to provide *factual* information related to the process underlying (1) the CCSAO's decision to vacate the underlying convictions, and (2) the process by which the CCSAO treats COIs." (Doc. 590, at 2) (emphasis in original). Unable to reach an agreement, the CCSAO filed the motion to quash supported by the Scheller Declaration asserting in relation to the COI petitions that "[t]o divulge the *process* by which the CCSAO investigates and determines how to approach a COI would open the process up to outside influence. Interested individuals outside of the CCSAO may try to manipulate the process itself in order to achieve a favored outcome." (Doc. 534-3, Scheller Aff. ¶ 8) (emphasis added).

This conclusory assertion is insufficient to demonstrate that information about the CCSAO's process in connection with petitions for COIs (or to vacate convictions) would disclose deliberations that are protected by the deliberative process privilege. In addition, the CCSAO already has publicly disclosed considerable information about the CCSAO's process at various points in time. For example, the opinion issued in *Brown v. City of Chicago*, 633 F. Supp. 3d 1122 (N.D. Ill. 2022), contains a description of the CCSAO's policy when reviewing a petition for a COI for the period at issue in that case which overlaps in part with when petitions for COIs were obtained in certain Watts-related cases:

> The policy of the CCSAO in mid-December 2017 through February 2018, when reviewing a petition for a COI, was to consider the following: (1) whether any CCSAO personnel could be subject to civil liability in a future proceeding; (2) the use and amount of resources that would need to be expended on investigating and litigating the COI proceeding; (3) procedural considerations; (4) legal issues; and (5) the factual circumstances of the case. . . . Actual innocence "could be" something the CCSAO considered when determining what position to take on a petition for COI under the factual and legal factors.

*Id.* at 1146.

Still more information about the CCSAO's process was provided on November 20, 2020 in Ms. Scheller's declaration in another unrelated wrongful conviction lawsuit:

> The CCSAO decides not to intervene on Certificates of Innocence for many reasons, oftentimes based on procedural, collateral, or evidentiary flaws unrelated to the CCSAO's belief in whether the individual is guilty of the charged crimes. For these reasons, the CCSAO may elect not to contest or pursue a retrial. If the CCSAO finds that it does not possess sufficient evidence to proceed with a new trial – regardless of its belief in an individual's innocence – it would logically follow that the CCSAO may not have sufficient evidence to oppose a Certificate of Innocence.

*Fulton v. City of Chicago*, 17 C 1896, Doc. 262-1, at 2; *see also Fulton* Tr. at 18-19 (Based on the information in the Scheller declaration, "the Court finds that the general factors that are considered by the State's Attorney's Office don't invade the pre-decisional

discussions and frankly are already talked about by the State's Attorney's Office in this filing.").

At times, information about the process for evaluating whether to vacate convictions has also been made public by the CCSAO.  A Chicago Tribune story in September 2018 reported "according to a [CCSAO] spokeswoman" that CIU attorneys "are reviewing 30 to 40 additional cases tied to Watts" and "[t]he unit investigates only the cases that are referred to its attorneys and does not actively seek them out."[9]  Another story included information from interviews with Plaintiffs' attorneys Joshua Tepfer and Joel Flaxman who reportedly said they had an arrangement with the CCSAO dating back to 2017 whereby documents, including their clients' sworn affidavits, were sent to prosecutors in support of their claims of having been framed.  The CCSAO then reviewed the documents and decided whether to throw out the convictions, and for the most part agreed to do so.[10]

Defendants believe the process of deciding whether to oppose a petition to vacate a conviction changed in late 2019 when Adduci replaced Rotert as Director of CIU.  The change, they say, is that Adduci requested to interview some of the Defendant Officers and then asked Plaintiffs to provide corroborative evidence to support their versions of events. (Doc. 567, at 12).  In November 2021, State's Attorney ("SA") Kimberly Foxx

---

[9]     Elyssa Cherney, *Top prosecutor Kim Foxx apologizes as 18 convictions linked to corrupt cop vacated*, Chicago Tribune (Sept. 24, 2018, updated May 23, 2019), https://www.chicagotribune.com/2018/09/24/top-prosecutor-kim-foxx-apologizes-as-18-convictions-linked-to-corrupt-cop-vacated/, *archived at* http://perma.cc/M5MX-RXEL.

[10]     Jon Schuppe, *Chicago's corrupt Sgt. Watts went to prison. 88 people he arrested now demand exoneration*, NBC News (Updated July 20, 2021), https://news.yahoo.com/dozens-were-framed-corrupt-chicago-083014735.html, *archived at* http://perma.cc/DL7R-KKNQ. According to the article, Tepfer and Flaxman reportedly said that while the process "worked well for a while… the progress has stopped," leading them to file a petition in July 2021 seeking to vacate convictions of 88 persons without an agreement with the CCSAO.

explained in a talk show program that over the past couple of years, the CCSAO had been looking at the Watts-related cases on an individualized basis to identify patterns and practices and things that showed corrupt behavior. She said it was necessary to perform due diligence by talking to witnesses and reviewing files in an exhaustive, deliberative and slow process.[11]

In addition, on February 1, 2022—after the CCSAO moved to vacate convictions in 20 cases but opposed doing so in 15 cases, SA Foxx reportedly said the CCSAO was "committed to reviewing each case separately, rather than simply throwing out all cases with any connection to the crew… We have to talk about them on an individual basis, it depends on who was working on the cases, the time period we're looking at, the sufficiency of the evidence, or other evidence[.]"[12] And a subsequent news story provided the following additional details about the process:

> Foxx told reporters last month that she would not follow the path of prosecutors in other parts of the country who have gone along with throwing out convictions en masse after police corruption scandals. Instead, she said her office would review the circumstances of each case.
>
> "We want to do our due diligence as officers of the court to be able to say that, in fact, the persons were not guilty of the crimes for which they were accused," Foxx said.

---

[11]     Andrea Guthmann, *83 people await potential exoneration in cases tied to disgraced former CPD sergeant Ronald Watts*, "Reset," WBEZ 91.5, https://www.wbez.org/reset-with-sasha-ann-simons/2021/11/10/83-people-await-potential-exoneration-in-cases-tied-to-disgraced-former-cpd-sergeant-ronald-watts, *archived at* http://perma.cc/V844-8BY3. The other guests on this particular program were Plaintiff Clarissa Glenn and one of her attorneys, Joshua Tepfer. *Id.*

[12]     (Doc. 568, at 17, Megan Crepeau, *20 more convictions linked to disgraced ex-CPD sergeant are tossed*, Chicago Tribune, (Feb. 1, 2022)), https://www.chicagotribune.com/news/criminal-justice/ct-ronald-watts-cases-dismissed-kim-foxx-20220201-cmftmcd5yjdgnpq7gof777anoe-story.html, *archived at* http://perma.cc/6CVE-AZHW.

Foxx said the factors in deciding whether to support vacating a Watts-tied conviction include which officers were working on the case, when they did the work, and the "sufficiency of the evidence."[13]

According to this same story, a CCSAO court filing had objected to vacating certain petitions, stating: "The ultimate question before the court is whether the new evidence places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt[.]...The People deny that petitioner can meet this burden." *Id.* note 13.

Testimony on the topics listed above about the CCSAO's process and criteria in making the decisions at issue would not reveal deliberations of the CCSAO staff or their recommendations and opinions about specific cases. Therefore, the Court finds that the deliberative process privilege does not apply. But Defendants must depose ASA Adduci on these topics first to avoid seeking cumulative and unnecessary testimony from non-parties Sussman, Magats, and Rotert.[14]

### C.    Deliberative Topics

The Court now turns to deposition topics that *do* seek to learn the CCSAO's deliberations. Defendants generally describe what they seek to learn as "why the CCSAO moved to vacate cases, what it relied upon in reaching its decisions, and whether it concluded Plaintiffs were factually innocent." (Doc. 567, at 7). Defendants further state that testimony on the following topics admittedly would "invade deliberative-process":

---

[13]    Chip Mitchell, *State's Attorney Kim Foxx is doubling down on dozens of convictions tied to a corrupt ex cop,* WBEZ Chicago (March 24, 2022), https://www.wbez.org/criminal-justice/2022/03/24/foxx-doubles-down-on-37-convictions-tied-to-corrupt-cop, *archived at* http://perma.cc/AMN2-MHHJ.

[14]    Had the Court found these topics to be deliberative, it would have allowed Defendants to depose the witnesses about them based on a particularized need for the information outweighing the CCSAO's need for secrecy. This is so because the testimony on these topics is limited (excluding deliberations in relation to specific cases) and the potential chilling effect is reduced given the information that the CCSAO has already made public.

- ASA Adduci's recommendations on whether convictions should be vacated and petitions for COIs opposed, and what led to certain recommendations being overruled.

- The decision to object to certain petitions to vacate only to reverse course and the reason for the reversal.

- How each case fits within the criteria used by the CCSAO when evaluating cases and why the criteria changed over time.

- The reasons for taking no position on the petitions for COIs.

(*Id.* at 26).

This Court agrees that questions on these topics, as well as several others proposed by Defendants, would elicit testimony protected by the deliberative process privilege.[15] Specifically, the questions would seemingly require testimony about the CCSAO's underlying analysis, internal dialogue and debate, advisory opinions, and recommendations as to each of the over 200 cases in which convictions were vacated. In this Court's view, even questions that purport to ask for factual information cross the line into deliberations when they require the witness to identify materials specific to a case "showing an individual's guilt," or that were "relied upon," or that SA Foxx personally

---

[15]     While not highlighted in the opposition brief, Defendants also describe the following topics in their non-inclusive list of proposed topics provided to the CCSAO:

- All factual information reviewed and relied upon, including (a) the nature and source of materials reviewed during the investigation, including those showing an individual's guilt, and (b) identification of interviews conducted and not conducted.

- Decision and reasoning to not inform the COI court of (a) controlling case law, and (b) when a claimant did not meet the statutory requirement of being innocent for all offenses for which he was incarcerated.

- The CCSAO's evaluation of Watts cases.

- Materials reviewed by Kim Foxx (e.g., police reports, petitioner affidavits, testimony and court findings regarding petitioners' pleas of guilty).

- Identification of cases appearing on any list of those cases that were recommended to NOT be vacated and identify these cases.

reviewed. *Cf. Brown* Tr. at 22-23, 28 (allowing CCSAO attorneys to be deposed about the "nature and source of materials reviewed" in a "general way"); *Fulton* Tr. at 17 (allowing questions about "the nature and sources of materials reviewed"). Therefore, Defendants may not seek testimony on these deliberative topics absent a finding of waiver or a showing of a particularized need for the information.

### D. Waiver of Deliberative Process Privilege

Defendants argue the CCSAO waived the privilege in the Watts-related cases due to public statements made about the cases, as well as the disclosure of deliberative information to COPA that has since been shared with Defendants. Like other privileges, the deliberative process privilege can be waived. *DeLeon-Reyes*, 2021 WL 3109662, at *5; *Hobley v. Chicago Police Commander Burge*, 445 F. Supp. 2d 990, 998-99 (N.D. Ill. 2006). As noted, the CCSAO's deliberations and resulting decisions occurred at various times over a six-year period relating to over 200 separate convictions. Defendants contend there has been a broad waiver as to all of these deliberations regarding whether to vacate any of these many convictions and oppose the subsequent petitions for COIs. As the CCSAO describes it, Defendants contend there has been a waiver of "every discussion, every question, every thought of every prosecutor involved in these cases, including the State's Attorney herself." (Doc. 590, at 6).

The facts and caselaw do not support a finding of the broad waiver that Defendants seek. As the case that Defendants rely on explicitly states, the waiver of the deliberative process privilege (as distinct from the attorney-client privilege), is narrower and extends only to "the document or information specifically released, and not for related materials." *In re Sealed Case*, 121 F.3d 729, 741 (D.C. Cir. 1997) (explaining that this "limited

approach to waiver" is "designed to ensure that agencies do not forego voluntarily disclosing some privileged material out of the fear that by doing so they are exposing other, more sensitive documents.").  *See also DeLeon-Reyes,* 2021 WL 3109662, at *5; *Hobley,* 445 F. Supp. 2d at 999.  For reasons discussed below, the Court finds that the CCSAO has only partially waived the deliberative process privilege as to certain information.

### 1.    Waiver from Disclosures to COPA in April 2018

Between April 19, 2018 and April 26, 2018, Adduci met with COPA investigators on five days to share information about CIU's work on the Watts-related cases.  Rotert, the CIU director, joined her at the initial two meetings.  COPA investigators took copious notes during these meetings, generating 27 pages of detailed "COPA Investigative Reports" and other memoranda that summarize what Adduci and Rotert reportedly told them ("the COPA summaries").[16]  COPA also created a spreadsheet reflecting much of the information appearing in the reports and memoranda.  Years later, COPA produced these materials (and voluminous other documents) to Defendants in response to subpoenas issued in the Watts coordinated cases.

According to these COPA summaries, Rotert and Adduci shared extensive information with COPA investigators about their deliberations, ultimate decisions, and supporting reasons for vacating (or not) the convictions of 22 Plaintiffs.[17]  During the initial

---

[16]    Two of the memoranda styled as a "COPA Investigative Report" state that the summaries are not verbatim accounts of what was said. (*See e.g.,* Doc. 774, at 3 ("This summary should not be treated as verbatim and the conversation was fluid, so this summary may not represent the precise order of conversation."); *Id.* at 6 ("The following is a summary of the discussions between COPA and the CCSAO. This summary should not be treated as verbatim.")).

[17]    These Plaintiffs are: Leonard Gipson (three arrests), Christopher Scott, Lionel White, Jr., Jamar Lewis, Frank Saunders, Marcus Gibbs, Andre McNairy, Henry Thomas, Jamell Sanders, Lee Rainey, William Carter, Shaun James, Allen Jackson, Robert Forney, Angelo Maurice Shenault (two arrests),

meeting, "Mark Rotert said that CIU will not provide copies of their work-product to COPA now. But Mr. Rotert said that CIU will allow COPA investigators to speak with ASA Adduci regarding her reasoning for vacating (or not vacating) a conviction, and will allow COPA investigators to read, but not copy, related memos and spreadsheets, if they exist." (Doc. 774, at 14). The next day, April 20, 2018, Rotert reiterated that "he was willing to allow COPA investigators to speak to Ms. Adduci regarding her *deliberations* in the Watts-related petitions." (*Id.* at 3) (emphasis added). As for the CIU's written materials, Rotert and Adduci reportedly "acknowledged that memoranda and a spreadsheet have been created designed to compare the facts of each allegation." (*Id.*). Rotert "indicated he was comfortable allowing COPA to review the memoranda and even photograph the spreadsheet" but "was not comfortable providing COPA with physical copies of any *deliberative* documents." (*Id.*) (emphasis added).

In the meetings with COPA, Adduci described in great detail her decision-making process when determining whether to recommend the Watts-related convictions then under consideration be vacated. As part of this discussion with COPA investigators, Adduci identified the criteria used in assessing whether to vacate convictions and explained the weight given to each and why. (*Id.* at 13-14). For example, one factor and related circumstances reportedly caused "CIU to lean toward maintaining the conviction" while another led CIU to "strongly lean towards vacating the conviction." (*Id.* at 13). Adduci also described the categories of documents reviewed before reaching any decisions, and her considerations when assessing the credibility of those involved in the arrests and prosecutions. (*Id.* at 4). Notably, she explained her thought process when

---

Angelo Shenault (two arrests), Phillip Thomas, Taurus Smith, Bruce Powell, and Lionel White, Sr. (Doc. 768, at 4 n.8).

analyzing each conviction, describing the specific information that caused her to find witnesses credible (or not), and the evidence she found to be important in deciding to recommend that a conviction be vacated.[18]

### a. Selective Waiver

Based on the extensive disclosures to COPA in April 2018 related to the CIU decisions made prior to that time related to 22 Plaintiffs, Defendants argue that the CCSAO has broadly waived the deliberative process privilege as to all Watts-related convictions vacated between 2016 and 2022. Conversely, the CCSAO argues that no waiver has occurred at all because "[t]he Northern District of Illinois has recognized that privileged communications disclosed for limited purposes—particularly to assist in government investigations and made under conditions intended to maintain confidentiality—are consistent with the principles of selective waiver." (Doc. 780, at 4, 6). In other words, it asserts that the CCSAO may selectively waive the privilege by disclosing deliberations to COPA without a resulting waiver as to others such as Defendants.

In support, the CCSAO relies on *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.* ("*Jaffe*")*,* 244 F.R.D. 412, 430 (N.D. Ill. 2006). In that case, the court ruled that Household had not waived the work product privilege by its voluntary production of privileged materials to the SEC. Hence it denied a motion to compel production of those documents filed by plaintiffs suing Household in a securities fraud class action. *Id.* at 433. Despite that ruling, the court acknowledged that "courts in this district have not viewed

---

[18] Regarding the earliest convictions that were vacated (those of Ben Baker, Clarissa Glenn, and Lionel White, Sr.), Adduci said she had no involvement in the decisions. But she identified the decisionmaker (ASA Fabio Valentini) and shared what she believed to be the reasons for the CCSAO vacating these convictions based on what Valentini reportedly told her. (Doc. 774, at 12, 29).

[the selective waiver concept] with particular favor[,]" decline[d] to adopt a per se rule regarding waiver with respect to government disclosures[,]" and remarked that it "cannot say with any certainty whether the Seventh Circuit would apply selective waiver in this context[.]" *Id.*

For their part, Defendants rely on *Burden-Meeks v. Welch* and other cases to support the contention that selective waiver is not permitted in the Seventh Circuit or any other circuit except the Eighth. (Doc. 768, at 6; Doc. 782, at 4-5); *Burden-Meeks v. Welch*, 319 F.3d 897, 899 (7th Cir. 2003) (citing *Dellwood Farms, Inc. v. Cargill, Inc.*, 128 F.3d 1122, 1126-27 (7th Cir. 1997) and other cases for the proposition that "[k]nowing disclosure to a third party almost invariably surrenders the privilege with respect to the world at large; selective disclosure is not an option[.]" While the Eighth Circuit disagrees, "the majority view is otherwise."). Defendants also argue that the CCSAO "fails to cite to a single case that is factually similar to the instant situation" where selective waiver was permitted. (Doc. 782, at 5).

Neither side has identified a case factually similar to the one now before the Court. As the CCSAO notes, the disclosure here was not to an adversary or in response to a subpoena from a government agency conducting an investigation of the CCSAO. Nor did the CCSAO disclose the deliberations to gain a strategic advantage. *Cf. Dellwood Farms*, 128 F.3d at 1127. Instead, as it argues, "the conversations between COPA and CCSAO personnel in this case were just that: frank discussions between government personnel in furtherance of the administration of justice." (Doc. 780, at 11). According to the COPA summaries, the CCSAO expressed interest during the meetings in gaining access to certain COPA records for each member of the Watts team to aid in its analysis.

23

And COPA investigators indicated that reviewing the CCSAO spreadsheet and memoranda and speaking with Adduci about her process would be useful in their ongoing COPA investigation of the officers involved in these cases. (Doc. 774, at 3).[19]

While these facts about the reasons for sharing the deliberative information with COPA are helpful to the CCSAO in the waiver analysis, they are outweighed by significant countervailing facts that distinguish this case from *Jaffe* and others on which the CCSAO relies. Most notably, extensive and granular details about the CCSAO's deliberations relating to 22 Plaintiffs (as summarized by COPA) *already* have been disclosed to Defendants. COPA provided five of those summaries to Defendants in 2021 (Doc. 734 ¶ 4). Twelve others were apparently not produced until April 2024 -- shortly after Defendants requested the materials following the deposition of a COPA investigator. (*Id.* ¶¶ 3, 4). But long before this, in 2022, COPA provided to Defendants a COPA-created spreadsheet containing much of the information reflected in all of the COPA summaries prepared from the Adduci meetings and CCSAO materials. (Doc. 780, at 3 n.1). In light of these prior disclosures first to COPA and then by COPA to Defendants, this is not a situation where Defendants are currently unaware of the content of Adduci's deliberations and the Court is being asked to keep it that way by allowing a selective waiver.[20]

---

[19] COPA is a government agency responsible for investigating allegations of police misconduct and determining whether the allegations are well-founded under a preponderance of the evidence standard. The agency's mission is also to identify and address patterns of police misconduct and make policy recommendations to improve the police department and reduce misconduct. Municipal Code of Chicago, 2-78-110 ("Purpose").

[20] Defendants brought the COPA summaries to the Court's attention in a supplemental brief (Doc. 731) filed after the April 2024 production of 12 of the COPA summaries which was months after the CCSAO's motion to quash was fully briefed though not yet decided. While Defendants initially said they only learned of the COPA summaries in April 2024, they subsequently filed a "corrected" supplement (Doc. 768) acknowledging that at least some of the COPA summaries had been produced long before this but claiming they failed to locate them due to a software search issue. (*Id.* at 1 n.1). The CCSAO asks the Court to find that Defendants waived their waiver argument by not raising it in a timely manner. (Doc. 780, at 4-5). The Court declines to do so as it appears the delay resulted not from gamesmanship but from

The fact that COPA readily provided the summaries of the Adduci deliberations to Defendants also persuades the Court that, unlike in *Jaffe*, the CCSAO did *not* disclose the privileged information to COPA "only on condition that [COPA] enter into a written confidentiality agreement." *Jaffe,* 244 F.R.D. at 430. In allowing a selective waiver under the facts presented in *Jaffe,* the court emphasized that "Household insisted on a confidentiality agreement to protect the information[,]" and the agreement "expressly stated that 'neither the [entity that received the privileged documents] nor Household intend to waive the protections of the attorney work product doctrine, attorney-client privilege, or any other privilege applicable as to third parties.'" *Id.*

In contrast, the CCSAO appears not to have even discussed with COPA the fact that Adduci was sharing privileged information, much less conditioned her doing so on COPA's willingness to enter into an express written agreement to maintain the confidentiality and privileged nature of the information. Had the CCSAO done so, perhaps COPA would not have generated and later produced the copious COPA summaries to Defendants in response to a subpoena, at least not without first attempting to withhold the materials based on a claim of privilege asserted by either COPA or the CCSAO. Undeterred, the CCSAO attempts to surmount this hurdle by explaining that it "shared information only with COPA and *reasonably understood* that the information would be kept confidential." (Doc. 780, at 6). But in support, the CCSAO points only to COPA regulations that its investigatory files and reports are confidential and not divulged except

---

Defendants' unawareness of these COPA summaries until the deposition of the COPA investigator. This is plausible as COPA produced 143,008 pages over time, and the COPA spreadsheet produced in 2022 (summarizing much of the information from the COPA summaries) was eight pages in small print. And as noted, most of the COPA summaries were not produced until April 2024. Finally, the Court allowed the CCSAO an opportunity to file a responsive supplemental brief, and it did so. (Doc. 780).

to certain law enforcement agencies and "as required by law." (*Id.*) (citing COPA Rules & Regulations, Article V, Section 5.2, https://www.chicagocopa.org/about-copa/rules-regulations/, *archived at* http://perma.cc/B6TD-WZAN).

It is worth noting that at the point when Adduci and Rotert shared the deliberative information with COPA in April 2018, a handful of Watts-related federal civil rights lawsuits already had been filed against Defendants, and the CCSAO knew more would follow as additional convictions were vacated. And the CCSAO certainly understood from past wrongful conviction cases that the parties to these lawsuits would issue subpoenas to COPA for relevant documents. When that happened and COPA received the subpoenas, neither COPA nor the CCSAO fought the disclosure of the COPA summaries on privilege grounds as presumably would have happened had an agreement been reached between them to do so. Instead, COPA simply designated the documents as "Confidential" under the protective order entered in the case before turning them over to Defendants to review. On balance, the Court is persuaded that the CCSAO's disclosure to COPA, and COPA's subsequent disclosure to Defendants, resulted in a partial waiver of the deliberative process privilege.

**b.    Scope of Waiver from COPA Disclosures**

Defendants argue that at a minimum they should be "permitted to depose Adduci and Rotert about the information contained in COPA's documentation." (Doc. 768, at 5). The Court agrees. Based on the record before it, the CCSAO has waived the privilege as to the CIU deliberations disclosed to COPA in April 2018 concerning decisions made in relation to 22 Plaintiffs. Hence, the CCSAO witnesses may be deposed about all the information contained in the COPA materials, including whether those materials

26

accurately summarize what Adduci and Rotert said during the meetings. What has not been waived due to the COPA disclosures are deliberations surrounding the decision not to oppose the petitions for COIs filed by these 22 Plaintiffs since the COPA summaries are silent as to this topic. Similarly, the summaries make no mention of deliberations with or between State's Attorney Kim Foxx and then First Assistant Sussman, so these deliberations are still protected absent a showing of a waiver on another basis (i.e., the media statements), or a particularized need for them. *Hobley*, 445 F. Supp. 2d at 999 ("[R]elease of documents only waives these privileges for the document or information specifically released, and not for related material.").

Defendants' alternative argument is that the CCSAO "waived the privilege entirely as to any other Watts-related cases in which the CCSAO agreed, or did not agree, to vacate a conviction[,]" because "Rotert agreed to waive the privilege for the CCSAO when he agreed to allow COPA to interview Adducci." (Doc. 768, at 5). This is unpersuasive. Absent evidence that the CCSAO in fact shared deliberations regarding its decisions made over multiple years about whether to vacate convictions of an estimated 158 additional Plaintiffs, the Court declines to find the broad waiver that Defendants seek based on nothing more than Rotert's statement in 2018. It is the sharing of the deliberations that followed Rotert's statement that resulted in the partial waiver. If the CCSAO opted to cease sharing deliberations with COPA after April 2018, the Court lacks a basis to declare a waiver as to the undisclosed deliberations that occurred in subsequent years.

27

## 2. Waiver from Public/Media Statements of CCSAO Representatives

Defendants also point to multiple public statements made by CCSAO representatives about the Watts-related cases over multiple years as the basis for finding a waiver of the deliberative process privilege as to all deliberations surrounding all decisions made in relation to the over 200 convictions vacated over that period. (Doc. 567, at 26). In total, they identify 20 specific statements made by Rotert, Adduci, and SA Foxx between November 2017 and April 25, 2023.[21] In her declaration, CCSAO representative Scheller disagreed that any waiver occurred: "While the CCSAO and some of its agents spoke very generally about these cases to the press, there was no disclosure of specific factual or legal analysis for any specific charge or case, nor of the deliberative process for any specific case." (Doc. 534-3, Scheller Aff. ¶ 7).

### a. Caselaw

As an initial matter, the CCSAO witnesses may certainly be deposed about their own public statements about Watts-related cases whether or not these disclose deliberations. Once deliberations are publicly disclosed, there is of course no basis to preclude deposition testimony about them to ostensibly keep those deliberations private. *Almodovar* Order, at 3 (allowing questioning of CCSAO witnesses about "information that would otherwise be privileged but has been disclosed by Sussman or other current or former members of the CCSAO in statements to the public, to plaintiffs' counsel, or in prior depositions."). *See also Brown* Tr. at 21 (ruling that Sussman and Rotert may be deposed about statements to the press, rejecting CCSAO argument that this would have chilling effect on deliberations).

---

[21] This opinion does not go through each of the 20 statements individually, but a complete recitation of those remarks and others cited in this Opinion can be found in attached Exhibit A.

At times, statements to the media may result in a partial waiver of any privilege. In *Fulton and Coleman v. City of Chicago*, Rotert, Sussman and SA Foxx gave media interviews in which they disclosed their reasons for the "decision to initially seek a retrial of the plaintiffs' cases and then move to dismiss the cases." *Fulton* Tr. at 4, 14. In the interview, Rotert explained at length why the DNA evidence did not exclude or exonerate plaintiffs and why Coleman's confession withstood scrutiny.[22] And in a separate interview, SA Foxx elaborated on the difficult deliberations that preceded the decision as well as the reasons for ultimately dropping the charges:

> Foxx says her office struggled with the cases of Coleman and Fulton. "The [CIU] unit itself concluded [Fulton/Coleman] was not a case of actual innocence," Foxx says. "But would we be able to meet the burden of proof at trial of guilt? The answer we had was no." Still, because of the questionable interrogations and lack of evidence, Foxx concluded the charges had to be dropped. "It troubled us," she says. "It pained us to try to characterize the right way to say what we were doing. These cases are really complicated."

(No. 17 C 8696, Doc. 241, at 5) (citing Kevin Davis, *Under Questioning: The Chicago Police Legacy of Extracting Confessions is Costing the City Millions*, ABA Journal (July, 2018), https://www.abajournal.com/magazine/article/chicago_police_false_confessions, *archived at* http://perma.cc/98HY-XN4S. Based on these public statements, the court allowed deposition testimony on the reasons for the decision, including undisclosed reasons. *Fulton* Tr. at 14 ("And while those public statements may not have included all the reasons, the Court finds that these statements made publicly are sufficient to

---

[22] These statements were made in October 2018 when Rotert, Sussman and Foxx were interviewed by reporter Steven Bogira for an article in The Marshall Project called *The Hustle of Kim Foxx*. (No. 17 C 8696, Doc. 241, at 6).

constitute a waiver as to the reasons for the decision for a retrial and then dismissal of the conviction in this case.").

Similarly, in *DeLeon-Reyes*, the court found a waiver based on public statements of Sussman explaining why he moved to dismiss a specific criminal case:

> [T]here is not a doubt in my mind or the mind of any prosecutor who has worked on this case that Mr. Solache and Mr. Reyes are guilty of these heinous crimes, but because Detective Guevara was the lead investigator in this crime, and because he has repeatedly refused to testify truthfully, the State's Attorney's Office has no choice but to dismiss the case against Defendants Solache and Reyes, and we would ask the Court to *nolle* those charges.

2021 WL 3109662, at *2. Since these public statements "revealed pre-decisional and deliberative elements to the CCSAO's decision to dismiss Plaintiffs' cases," the court found a waiver and allowed "testimony on the CCSAO's reasoning for dismissing the cases." *Id.* at *3.

### b. Public Statements in Watts-Related Cases

Against this backdrop, the Court considers the CCSAO statements about the Watts-related cases that were reported in the media and/or made in court hearings and filings. Based on these statements, Defendants seek a broad finding of waiver as to all deliberations surrounding all decisions to vacate over 200 convictions and not oppose petitions for COIs. This Court declines to find such a broad waiver. Instead, it focuses on the timing and content of the specific statements to determine whether there was a waiver and if so, its scope. The timing matters here because the CCSAO decisions occurred over a six-year timespan. A public statement about reasons for vacating convictions in Watts-related cases could only conceivably waive the privilege as to deliberations occurring *before* the making of that public statement. In other words, a

public statement in 2020 would not waive the privilege over deliberations occurring in 2021 and 2022 regarding whether to vacate convictions in those later years. As for content, the CCSAO's public statement must reveal some type of deliberative information to cause a waiver of deliberations. Thus, general statements about the harm in these cases but not divulging reasons for vacating convictions would not result in a waiver.

Specific public statements in the Watts-related cases are now examined under these parameters.

### 1. Media Statements

Beginning in 2017, the CCSAO made public statements that at times revealed specific reasons for the CCSAO's decision to vacate small groups of convictions, though not in the same detail as in *Brown, DeLeon-Reyes,* and *Fulton.* Plaintiffs have quoted from many of these media stories in their complaints, as shown in the following complaint:

97. On November 16, 2017, upon the State's motion, Judge LeRoy K. Martin, Jr. vacated and nolle prossed all of the convictions related to the fifteen (15) Petitioners named in the Consolidated Petition.

98. In commenting on the extraordinary decision to agree to vacate all the convictions tied to Watts and his team, the head of CCSAO's Conviction Integrity Unit, Mark Rotert, stated that, *"In these cases, we concluded, unfortunately, that police were not being truthful and we couldn't have confidence in the integrity of their reports and their testimony*."

99. On September 24, 2018, eighteen (18) other similarly situated innocent victims were given a semblance of justice. Upon the State's motion, Judge LeRoy K. Martin, Jr. vacated 23 convictions, and the State nolle prossed all charges related to the convictions stemming from Watts and his team's wrongful arrests.

100. Following this decision, Mr. Rotert explained that "*these arrests were purely conjured . . . . [Watts and his team] were basically arresting people and framing them or were claiming they were involved in drug offenses that either didn't occur or didn't occur the way these police officers said*."

101. At a press conference where she stood side-by-side with many of the exonerated, Cook County State's Attorney-Elect Kimberly Foxx stated that "[t]he system owes an apology to the men who stand behind us."

102. On November 2, 2018, seven (7) more victims had eight (8) additional convictions voluntarily dismissed by the CCSAO.

103. In a press release, CCSA Foxx stated that the *"pattern of misconduct" by Watts and his team caused her "to lose confidence in the initial arrests and the validity of these convictions*."

104. Referring to the exonerees as "victims," Ms. Foxx wished them "a path forward in healing and justice."

105. The CCSAO has since voluntarily dismissed additional convictions.

106. On February 24, 2020, after another mass dismissal and in reference to the Watts scandal, Ms. Foxx stated: "I think it's important that we acknowledge the harm that was caused when we talk about these cases. It's not just these men. It's the erosion of the trust in the justice system when we allow for those [men] to be *wrongfully convicted based on the misdeeds of corrupt law enforcement*."

107. On December 15, 2020, after another mass dismissal and in reference to the Watts scandal, Ms. Foxx stated: "The seeds of distrust for our criminal justice system run deeply in communities most impacted by violence because of *people in power like Sergeant Watts and his cronies who targeted and criminally preyed on these communities*, leaving these neighborhoods feeling like their voice didn't matter." Regarding the exonerations, Ms. Foxx went on to state that it is "always the right time to do the right thing" and "never too late to deliver justice" to the Watts-related victims.

108. On February 19, 2021, after yet another mass dismissal, Ms. Foxx stated: "Vacating the convictions of these nine people today who were targeted by former Police Sergeant Watts provides just a fraction of relief for those who spent time in prison, away from their families, as we will never be able to give them that time back."

109. In a press release on November 4, 2021—when five (5) more convictions were dismissed—Ms. Foxx stated: "As prosecutors, we know that harm was caused …Today is a step towards righting the wrongs of the past and giving these individuals their names back."

(*Joseph Perry v. City of Chicago*, No. 23 C 14364, Doc. 1, at 13-15) (italics added). The statements attributed to Rotert on November 16, 2017 appeared in an ABC News story. (Doc. 568, at 4, John Garcia, *Mass exoneration: Convictions of 15 men, tied to tainted CPD officer, overturned*, ABC News (Nov 16, 2017)). Another story that same day reported that Rotert "declined to speak about specific evidence that led State's Attorney Kim Foxx to move to ask the courts to drop the charges. But he noted that his unit saw a troubling trend of defendants complaining early during their prosecution that drugs had been planted on them by Watts and his officers." (*Id.* at 11, Aamer Madhani, *Men who allege they were framed by crooked Chicago cop get mass exoneration*, USA Today (Nov. 16, 2017)).

The Court finds from these public statements that Rotert and at times SA Foxx revealed some pre-decisional and deliberative elements to the CCSAO's decisions to dismiss the cases about which they spoke, namely, the reasons for these decisions. As noted above, the CCSAO said it had uncovered a "pattern of misconduct by Watts and his team"; determined that they had not been truthful so the CCSAO lacked confidence in the integrity of their reports and testimony and the validity of the convictions; and concluded that people had been arrested, framed, and extorted by planting drugs and guns on them. In arguing against waiver, the CCSAO says these statements about the police not being truthful and their being engaged in corrupt activity "simply explain[ ] the circumstances under which the cases came to be reviewed." (Doc. 590, at 7). This Court disagrees since the CCSAO had to derive these "circumstances" (really conclusions) from analyzing the underlying facts and making credibility findings and judgment calls.

33

Where the CCSAO disclosed to the media the reasons for vacating a group of convictions, the Court finds a partial waiver of the privilege. *Fulton* Tr. at 14 (finding waiver as to reasons for decision even though the public statements did not include all the reasons for the decision). Therefore, defendants are permitted to ask questions about the reasons, such as what (generally speaking) Rotert determined the police were not truthful about and how this was determined. Defendants may not, however, seek detailed information about the specific evidence considered as to each vacated conviction or the reasons why a specific statement in a specific police report was deemed credible or not. This was not disclosed in the public statements, and Rotert expressly declined to reveal this type of information.[23] For the same reasons, the CCSAO has not waived the privilege as to any internal and undisclosed debate over the issues surrounding the vacating of these convictions (assuming this occurred). *Sullivan v. Warminster Tp.*, 274 F.R.D. 147, 149-50 (E.D. Pa. 2011) (Police chief's limited statement during a press conference that outside counsel's investigation revealed no misconduct and that police department had "gotten a clean bill of health on everything" waived work product privilege only with respect to specific communications between counsel and client, not with respect to entire investigation).

### 2. Public Statements in Court Proceedings

In addition to media statements, the CCSAO sometimes revealed its deliberations about reasons for vacating convictions in court hearings and filings. This happened on February 19, 2021 when Adduci appeared in the Circuit Court of Cook County and moved

---

[23]     To the extent this type of information was disclosed to COPA and memorialized in the COPA summaries for a particular case, Defendants may pose questions to Adduci about these matters, and if necessary to Rotert.

to vacate the convictions of nine individuals. While news stories reported on the events that day (Doc. 568, at 46-47), a transcript of the hearing itself indicates that Adduci stated (in part) that "the People have lost confidence in some of the evidence that is the foundation for these convictions." (Doc. 567-19, at 12). She also clarified that "[t]he claims of the defendants are not necessarily the People's findings on these matters, however, with the application of Blackstone's ratio and in the interest of justice, there are enough questions that we do have issues with some of the credibility of some of the evidence supporting the convictions…." (*Id.*). According to Defendants, "Blackstone's ratio is, it is better to let ten guilty persons escape than that one innocent suffer." (Doc. 567, at 12, n.4 (citing *U.S. v. Davis*, 562 F.2d 681, 696 (D.D.C. 1977) (Bazelon, J., concurring)).

Over a year later, in March 2022, the CCSAO filed written objections to petitions of certain Plaintiffs to vacate their convictions. (*Id.* at 13). News stories reported on the content of these filings, including the CCSAO's statement that the "ultimate question" was "whether the new evidence places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt," a burden the CCSAO denied the petitioners could meet.[24] But about a month later, in April 2022, the CCSAO moved to vacate *all* these same 44 convictions, withdrawing the objections. The CCSAO lawyer who appeared in court reportedly explained the rationale for the reversal this way:

---

[24] Chip Mitchell, *State's Attorney Kim Foxx is doubling down on dozens of convictions tied to a corrupt ex cop,* WBEZ Chicago (March 24, 2022), https://www.wbez.org/criminal-justice/2022/03/24/foxx-doubles-down-on-37-convictions-tied-to-corrupt-cop, *archived at* http://perma.cc/AMN2-MHHJ. The story concluded by noting that prosecutors would now need to "defend the arrests in court hearings – a challenging assignment without testimony by the disgraced officers, who include Watts, the other cop who was sent to prison, and 10 officers whom Foxx's office does not call to the witness stand due to 'concerns about their credibility' because of close ties to the former sergeant." *Id.*

Malloy said the opposition [to vacating] had been due to the arrests involving "officers who have not been impugned in Watt's [sic] nefarious conduct." But the arrests also involved cops "discredited" because of their Watts ties, Malloy said. The role of those officers "raises concerns about the integrity of these cases."[25]

Based on the public statements in open court and in court filings, the Court finds that the CCSAO waived the deliberative process privilege but only as to the reasons for taking the actions that it did in the particular cases identified at that time. Defendants may therefore question Adduci at her deposition about these public statements and the reasons for the CCSAO objecting (or not objecting) to petitions to vacate the convictions in these cases, or for changing its decision. They may not, however, elicit information about earlier and undisclosed internal debate and deliberations within the CCSAO surrounding these decisions in an effort to learn, for example, the specific positions, arguments, recommendations and analysis of various people involved in the decision-making process.

### E.    Particularized Need

There is one remaining issue. For those deposition topics that the parties have agreed (or the Court has found) seek the CCSAO's privileged deliberations – and where no waiver has been found allowing testimony on the topics – Defendants assert they are entitled to depose the witnesses for another reason: they claim they have met their burden of demonstrating a particularized need for the information that outweighs the CCSAO's need for secrecy. In deciding whether this is so, the Court "balances the discovering

---

[25]    Chip Mitchell, *In Cook County's largest mass exoneration, a judge tosses 44 convictions tied to a corrupt cop*, WBEZ Chicago (April 22, 2022), https://www.wbez.org/criminal-justice/2022/04/22/judge-tosses-44-more-convictions-tied-to-corrupt-chicago-cop, *archived at* http://perma.cc/WHR8-UH9W. The story also said court records reflected that the number of reversed convictions now totaled 213, and the number of exonerees totaled 172. *Id.*

party's need for disclosure against the government's need for secrecy, considering such factors as (1) the relevance of the [information] to the litigation; (2) the availability of other evidence that would serve the same purpose as the [deliberative testimony] sought; (3) the government's role in the litigation; (4) the seriousness of the litigation and the issues involved in it; and (5) the degree to which [deposition] sought would tend to chill future deliberations within government agencies, that is, would hinder frank and independent discussion about governmental policies and decisions." *DeLeon-Reyes*, 2021 WL 3109662, at *4. *See also Ferrell v. U.S. Dep't of Housing and Urban Dev.,* 177 F.R.D. 425, 429 (N.D. Ill. 1998); *Holmes v. Hernandez*, 221 F. Supp. 3d 1011, 1016 (N.D. Ill. 2016).

### 1.    Relevance

Defendants argue that deposition testimony on the deliberative topics at issue is relevant since it "directly relates to the favorable termination element of Plaintiffs' state law malicious prosecution claims." (Doc. 567, at 7).  They reason:

> In a group of over 180 lawsuits in which Plaintiffs allege they were framed, wrongfully convicted, and will be asking juries for damages of millions and millions of dollars, the Defendant Officers should be afforded the opportunity to discover why the CCSAO moved to vacate cases, what it relied upon in reaching its decisions, and whether it concluded Plaintiffs were factually innocent.

(*Id.*).  The Court agrees that information about the CCSAO's reasons for agreeing to vacate the convictions and not oppose the COIs is relevant.  To prevail on their malicious prosecution claims, each Plaintiff must prove "not only that his conviction was vacated but that the prosecution was favorably terminated in a manner indicative of innocence." *Patrick v. City of Chicago*, 974 F.3d 824, 832 (7th Cir. 2020) (citing *Swick v. Liautaud*, 169 Ill.2d 504, 513, 662 N.E.2d 1238, 1243 (1996)).  In other words, "[t]he circumstances

surrounding the abandonment of the criminal proceedings must compel an inference that there existed a lack of reasonable grounds to pursue the criminal prosecution." *Swick,* 169 Ill.2d at 513-14, 662 N.E.2d at 1243 (citation omitted).[26]  Given the holding in *Swick,* "it is imperative to examine why prosecutors dropped the charges" when determining whether a plaintiff can prove a proceeding was favorably terminated in a manner indicative of innocence. *Brown,* 633 F. Supp. 3d at 1169.

To satisfy their burden, Plaintiffs have alleged in their complaints, and undoubtedly will seek to prove at trial, that the CCSAO not only agreed to vacate their convictions but in conjunction with those decisions, sometimes described Plaintiffs as victims who had been framed and extorted by corrupt police officers. *See supra* p. 31 (Mr. Rotert explained that "these arrests were purely conjured . . . . [Watts and his team] were basically arresting people and framing them or were claiming they were involved in drug offenses that either didn't occur or didn't occur the way these police officers said.").  Based on the allegations in their complaints, Plaintiffs will also likely seek to meet the "indicative of innocence" element by offering evidence that they received COIs.  (*See e.g., Perry*, No. 23 C 14364, Doc. 1, at 16 ¶ 113) ("Mr. Perry received a certificate of innocence stemming from his arrest and conviction certifying that Mr. Perry was, in fact, innocent of the crime of which he was convicted and for which he should never have been arrested in the first place.").  In *Patrick,* the court held that the COI "was directly relevant to an

---

[26]     The *Swick* court explained that abandonment is not indicative of the innocence of the accused when it "is the result of an agreement or compromise with the accused, misconduct on the part of the accused for the purpose of preventing trial, mercy requested or accepted by the accused, the institution of new criminal proceedings, or the impossibility or impracticability of bringing the accused to trial." 169 Ill.2d at 513, 662 N.E.2d at 1243.  The court held that the State's "bare use of the nolle prosequi order, which did not state its reasons for its entry" was insufficient to demonstrate that the case was "terminated in a manner consistent with Swick's innocence[,] and "Swick did not prove that the State lacked reasonable grounds to pursue the criminal charges." *Id.* at 514, 662 N.E.2d at 1243.

element on which [Patrick] bore the burden of proof: that the prosecution against him was terminated in a manner indicative of innocence." 974 F.3d 832-33.[27]

Defendants believe Plaintiffs will go further and ask the jury to infer that "if the CCSAO believed Plaintiffs were guilty, it would not have moved to vacate the convictions or at least it would have objected to the petitions for a COI[,]" and so seek discovery that could counter this inference. (Doc. 567, at 32). Defendants observe that "[t]here could be many reasons other than innocence for why a prosecutor would vacate these convictions, such as Defendant Watts and/or Mohammed's name simply appearing on the police reports or a policy decision not to fight for convictions for which they were associated with." (*Id.*). Similarly, "to rebut the impact of the COIs," the Defendant Officers seek to discover "if the CCSAO's position was based on factors other than innocence, such as resource allocation or indifference because the CCSAO was not exposed to civil liability." (*Id.* at 33).

The Court agrees that discovery of the CCSAO's reasons for vacating convictions and not opposing petitions for COIs is relevant for the reasons identified by Defendants and given Plaintiffs' burden to establish that their criminal cases were terminated in a manner indicative of innocence. *See Fulton* Tr. at 6-7 (finding that where plaintiffs might seek to use COIs at trial as evidence of actual innocence, it was "relevant for the

---

[27] A COI "entails a finding by a state-court judge that a criminal defendant has shown by a preponderance of the evidence that he 'is innocent of the offenses charged in the indictment or information.'" *Patrick,* 974 F.3d at 832 (citing 735 Ill Comp. Stat. 5/2-702(g)(3)). The *Patrick* court observed that the petition in that case only "summarized the evidence," without "affidavits or other evidence," and no hearing had been held. In addition, the state Attorney General and the CCSAO (the only parties permitted to oppose the petition) had taken no position, so the COI did "not really reflect a factual finding arising from the crucible of the adversarial process, which our legal system regards as the best means of discovering the truth." *Id.* Given all this, the court acknowledged the "defendants were understandably concerned that jurors may be tempted to give conclusive weight to the certificate of innocence merely because it reflects a formal judicial finding." *Id.*

defendants to then explore rebuttal evidence designed to show or argue that these decisions by the State's Attorney and the Certificate of Innocence is not automatically indicative of innocence."); *See also Hobley*, 445 F. Supp. 2d at 998 ("Because Ryan's [pardon] determination will be part of the evidence presented to the trier of fact in these cases, the basis on which Ryan made that determination is within the scope of discovery."); *Evans*, 231 F.R.D. at 310 ("[G]iven that there are no in limine rulings at this time barring the admission of that evidence, we cannot say that the information sought by the police officer defendants is outside the scope of "relevance" as defined in Rule 26, at least insofar as the police officer defendants seek documents and testimony to probe the basis for the pardon.").[28]

For these reasons, the relevance factor weighs in favor of disclosure here, though "relevance alone is an insufficient reason for breaching the deliberative process privilege." *Farley*, 11 F.3d at 1390.

## 2. Availability of Other Evidence

Defendants argue that the second factor (the availability of other evidence that would serve the same purpose as the testimony they seek on the deliberative topics) also weighs in favor of disclosure. They reason that the only way for them to determine "the prosecution's grounds for vacating convictions" and "decision to take no position on Plaintiffs' petitions for a COI" is to ask the CCSAO. (Doc. 567, at 32). The CCSAO

---

[28] Relying on dicta from this Court's decision in *Saunders v. City of Chicago,* No. 12 C 9158, 2015 WL 4765424, at *21 (N.D. Ill. Aug. 12, 2015), the CCSAO argues that its deliberations are "irrelevant since the [Illinois state] court granted the certificates rather than the [CC]SAO" (Doc. 590, at 12) This is not persuasive. In *Saunders*, after ruling the *plaintiffs* did not have a particularized need for deliberative testimony from the CCSAO witness "to [ostensibly] challenge the validity of the court's decision *granting* the certificates," this Court added: "Of course, the SAO deliberations would also be irrelevant since the court granted the certificates rather than the SAO." 2015 WL 4765424, at *21 (emphasis added). This Court no longer agrees with its own dictum in *Saunders* based on the later analysis in *Patrick* and certain other cases discussed in this Opinion.

responds that there is "an obvious alternative to the four vastly overbroad depositions that Defendants have demanded – the CCSAO has agreed to the deposition of ASA Nancy Adduci, or alternately a Rule 30(b)(6) deposition on agreed upon topics." (Doc. 590, at 12). On its face, this statement would appear to mean the CCSAO does not object to providing the deliberative information as long as the vehicle is a deposition of Adduci or a 30(6)(6) witness rather than of Sussman, Magats and Rotert. But closer scrutiny of the CCSAO's arguments suggests that it instead is arguing that Adduci or a Rule 30(b)(6) witness is available to provide *non-deliberative* testimony of a factual nature and so Defendants do not have a particularized need for the deliberative testimony that they seek.

The problem with this argument is that the CCSAO does not describe what this factual testimony would be and how it would obviate the need for testimony on the reasons for vacating convictions and not opposing COI petitions. It is also worth noting that any such "other" evidence would not necessarily be the same in each of the estimated 178 cases filed by Plaintiffs given the changes that appear to have occurred within the CCSAO over the six years when decisions were made in relation to the many convictions that ultimately were vacated. For example, the CIU was not involved in the review of the earliest Watts-related cases in which Plaintiffs requested the CCSAO to vacate their convictions. In the very first case (that of Plaintiff Ben Baker), an Assistant State's Attorney prepared a 15 page memo in December 2015 that summarized in great detail the facts and analysis in support of her recommendation that the conviction *not* be vacated. (Doc. 567, at 8) (citing Doc. 567-5, at 13-14).[29] A few weeks later (after a high-

---

[29] The memo recounted the history of the 2005 Baker case (e.g., pre-trial discovery, evidence at trial, closing arguments, post-conviction history) and then analyzed the "Present Issue: Does New Evidence

level supervisor, Fabio Valentini, reviewed the memo and forwarded it to Magats), the conviction was vacated upon the CCSAO's motion. (Doc. 567-7). This memo was produced to Defendants and is an alternative source of evidence regarding the CCSAO's deliberations in the Baker case. The Court does not know if similar memos were prepared in other cases and produced to Defendants.

In addition, based on rulings in this Opinion, Defendants will have access to testimony about the CCSAO's process when making decisions to vacate convictions and not oppose COI petitions (and the criteria used) during the relevant time period. Defendants already have the COPA summaries and will be able to obtain testimony from Adduci (and Rotert if necessary) about these summaries. While this evidence focuses on only two dozen cases reviewed by the CIU prior to April 2018, it is likely to be helpful in subsequent cases in which Adduci followed the same process. Finally, the Court has ruled that Defendants may depose the CCSAO witnesses about the reasons for decisions to vacate certain convictions (or not) where the privilege was partially waived through public statements about those reasons. Again, this testimony focuses only on the convictions that were the subject of the public statements but may be helpful in other cases too.

No public statements appear to have been made by the CCSAO about the reasons for not opposing COIs in Watts-related cases. But Defendants have a CCSAO policy as well as a declaration of a CCSAO representative that identify the factors that are

---

Show that Baker was Framed by Watts' Partners?" As part of that analysis, the memo summarized the facts including "New Evidence from Loevy-Attached as Exhibits to Supplemental, Successive Petition" which were apparently redacted copies of Watts' "federal investigation documents and other materials." The memo ended with the ASA's conclusion that the case against Baker was strong and there was no evidence that the arresting officers were implicated in Watts' corruption and had falsely arrested or framed Baker. (Doc. 567-5, at 14).

considered. Notably, a number of these factors have nothing to do with innocence. *See supra* p. 14 (factors include whether any CCSAO personnel could be subject to civil liability in a future proceeding and the use and amount of resources needed to investigate and litigate the COI proceeding). Finally, Defendants have access to all the evidence in each of the underlying criminal cases. Depending on the strength of that evidence, Defendants may be able to argue in certain cases that the evidence of the crime was so strong that the jury should infer that the CCSAO's decision could only have been based on factors other than innocence.

In sum, Defendants have at least some evidence available to them aside from the deliberative testimony at issue from which they may gain insight into the CCSAO's decisions and ask a jury to draw inferences that support their positions. But the extent of this "other" evidence is not uniform among all the Watts-related cases. It is fairly substantial in the cases involving convictions vacated prior to April 2019 given the COPA summaries and other evidence described above, so this factor weighs against disclosure in those cases. As for the ones involving convictions vacated after April 2019, Defendants appear to have considerably less "other" evidence available to them, so this weighs in favor of disclosure.

### 3.    Government's Role in the Litigation

Turning to the government's role in the litigation, the CCSAO points to *Evans v. City of Chicago*, 231 F.R.D. 302, 317 (N.D. Ill. 2005), arguing that the case supports non-disclosure here since the CCSAO is not a party to the lawsuit and its conduct does not bear on whether Defendants caused innocent persons to be convicted. (Doc. 590, at 13). In *Evans,* the non-party was the Governor's Office that simply issued a pardon. In

contrast, non-party CCSAO was extensively involved in many of the underlying events since it prosecuted the criminal cases that resulted in Plaintiffs' convictions, and later agreed to vacate those convictions and not oppose the COI petitions. Given this, Defendants contend that the "CCSAO's decisions throughout Plaintiffs' criminal proceedings bear directly on the claims and defenses in these cases." (Doc. 567, at 33).[30]

On balance, the Court finds that this factor weighs only slightly against disclosure given the CCSAO's role in many of the underlying events.

### 4.    Seriousness of the Issues

The parties are in agreement that the issues in the litigation are serious so this factor weighs in favor of disclosure to Defendants.

### 5.    Chilling Effect

The final factor is the potential "chilling effect" on future deliberations within the CCSAO if the deliberative information at issue is disclosed. In assessing the extent of this chilling effect, the Court considers the specific deliberative information that Defendants seek and the surrounding circumstances. Defendants insist that the testimony would not chill future deliberations by prosecutors because "[i]t has been over seven years since Baker had his convictions vacated and six years since the first mass proceeding vacating convictions." (Doc. 567, at 34). In support, they cite *Bahena v. City of Chicago*, No. 17 C 8532, 2018 WL 2905747 (N.D. Ill. June 11, 2018), a case that considered whether to order production of a two-page memorandum drafted by an ASA

---

[30]    Defendants go so far as to argue that the lawsuits "only exist because of the decisions of the CCSAO." (*Id.*). The CCSAO rejects this "astonishing claim" and in turn accuses Defendants of seeking to depose the four witnesses "not to discover facts, but to shift blame and attempt to punish the Office for the positions it has taken with respect to the prosecutions of the underlying Plaintiffs." (Doc. 590, at 1-2). This Court has already ruled that the testimony sought by Defendants is relevant. Disputes over the admissibility of any testimony that ultimately may be discovered, and the arguments that may be made to the jury based on the evidence, must be resolved by the trial judges.

that included deliberative information, including the ASA's opinion as to the ultimate weight of the evidence and whether it was sufficient to prove Bahena's involvement in the crime. *Id.* at *1. The court found that all five particularized need factors weighed in favor of disclosure. As to the chilling effect factor in particular, the court remarked that four years had passed since the decision was made to dismiss the charges against the plaintiff. *Id.* at *4. Hence, the court indicated it was unpersuaded that disclosure of the two-page document "would have a chilling effect on a future prosecutor's willingness to objectively and candidly assess a case and recommend when appropriate, that the charges be dismissed because the facts do not support a finding of guilt beyond a reasonable doubt." *Id.* Significantly, the court also observed that "[i]n the context of this case, disclosure of the [m]emorandum will not reveal more substantial information than the ASA had already testified about during her deposition." *Id.*

The CCSAO, on the other hand, relies on this Court's decision in *Saunders* to argue that disclosure of deliberations would have a significant chilling effect. (Doc. 590, at 13). There a former CCSAO attorney (also a defendant in the case) refused to answer specific deposition questions to which the CCSAO invoked the privilege. In ruling that plaintiffs had not shown a particularized need for the testimony, this Court considered (among the other factors) that allowing the testimony would cause a chilling effect and negative impact on the quality of prosecutorial decisions. 2015 WL 4765424, at *23.

Neither *Bahena* nor *Saunders* involved facts similar to those at issue here. Defendants are not asking (as in *Bahena*) for a single and very short memorandum containing information already disclosed at a prior deposition. Nor are they (as in *Saunders*) seeking to compel answers to specific (and in some instances improper)

45

questions posed during a deposition about a single case. Instead, Defendants here seek a ruling allowing them to learn *all* of the CCSAO's deliberations surrounding decisions over a six-year period related to an estimated 200 convictions. They seek to learn not simply the process and criteria applied in these cases generally (information this Court has now required the CCSAO to provide), but detailed information specific to each conviction such as: (a) how the criteria were applied to the facts to reach the decision; (b) the evidence that, in the CCSAO's view, showed guilt or innocence; (c) what the initial recommendation was on whether to vacate the conviction and why; (d) the deliberations prior to a final decision being made on whether to agree to vacate the conviction; (e) the circumstances and deliberations that led in some instances to the overruling of an initial recommendation *not* to vacate a conviction; and (f) the deliberations that led the CCSAO not to oppose the petition for a COI and not inform the state court of certain information that Defendants believe to be pertinent to the decision.

The Court finds that disclosure of the CCSAO's deliberations to this broad extent would have a significant chilling effect on future deliberations and would adversely affect decision-making. *DeLeon-Reyes*, 2021 WL 3109662, at *5 ("[T]he need for the CCSAO to protect from disclosure their deliberations is substantial in order to promote full and frank discussion in prosecutorial decision-making."); *Leopold v. Office of Director of Nat'l Intelligence*, 442 F. Supp. 3d 266, 274 (D.D.C. 2020) ("Discussions among agency personnel about the relative merits of various positions which may be adopted are just as much a part of the deliberative process as the actual recommendations and advice which are agreed upon.") (internal typo corrected). This factor thus weighs against disclosure, at least to the extent the disclosure would be as broad as Defendants seek.

46

### 6.    Particularized Need Conclusion

Weighing all the factors, the Court finds that Defendants have not met their burden of demonstrating a particularized need for the extensive deliberative information that they seek that outweighs the CCSAO's need for secrecy.  They have, however, shown a particularized need to learn the CCSAO's reasons for vacating the Watts-related convictions.  When the disclosure is limited to this particular category of deliberative information, the potential chilling effect is substantially reduced.  Indeed, the CCSAO opted to publicly disclose the reasons for vacating convictions in many Watts-related cases despite the potential chilling effect.  Requiring disclosure of the reasons in other Watts-related cases where the CCSAO has been silent on the topic would not, in this Court's view, result in a chilling effect that outweighs Defendants' need for the information. To be clear, under this ruling, the CCSAO is not required to provide the underlying analysis as to each conviction, or describe the internal debate and deliberations that occurred.  Consequently, this ruling does not result in the CCSAO operating in a "fishbowl" in a way that would "undermine the quality of … decision-making by preventing the full and frank exchange of ideas on legal and policy matters." *Leopold,* 442 F. Supp. 3d at 274 (citations omitted).

The Court declines to require testimony about the reasons for not opposing COI petitions as Defendants have not shown a particularized need for that testimony that outweighs the CCSAO's interest in secrecy.  The CCSAO has not disclosed these reasons in any Watts-related cases, so the chilling effect would be significant if ordered to do so now with respect to over 200 COI petitions.  And as noted earlier, Defendants have other evidence available to use in challenging Plaintiffs' anticipated arguments

about the import of the COIs and the CCSAO's decision not to oppose them, and more is forthcoming based on the rulings in this Opinion. *See Fulton* Tr. at 18-19 ("While they will not know the exact reasons…why the [COI] was not opposed because of the privilege" the availability of the general factors considered by the CCSAO in making these decisions "will give the defendants enough to counter arguments that the [COI] is representative of innocence" and "allow the jury to make various inferences from the arguments that are made by counsel.").

## III.    Mental Process Privilege and Work Product Doctrine

The Court lastly addresses the CCSAO's argument, raised only in its opening brief, that the requested depositions should be disallowed pursuant to the mental process privilege and/or the work product doctrine. (Doc. 534, at 10-11). "As courts have recognized, the mental process privilege is 'inex[tr]icably intertwined' with the deliberative process privilege." *DeLeon-Reyes*, 2021 WL 3109662, at *6 n.5 (citing *U.S. v. Denlinger*, No. CIV. S86-51, 1989 WL 516267, at *4 (N.D. Ind. Sept. 13, 1989)). *See also Almodovar* Order, at 2 n.2 ("The mental process privilege, which applies to deliberations by a government official involved in making an official decision, is co-extensive with the deliberative process privilege."). This Court agrees and sees no reason to separately address a mental process privilege in this case. *DeLeon-Reyes*, 2021 WL 3109662, at *6 n.5 (citing *U.S. v. Lake County Bd. of Com'rs*, 233 F.R.D. 523, 527 (N.D. Ind. 2005) ("where the mental processes privilege is available, the analysis is the same as that for the deliberative processes privilege.")).

Nor does the Court need to consider the CCSAO's rather cursory assertion that mental impressions constitute "intangible" work product protected by the common law

work-product doctrine.  (Doc. 534, at 11).  As the *DeLeon-Reyes* court noted, "[t]he law on the application of the attorney work product doctrine to third parties in litigation is not so clear."  2021 WL 3109662, at *6 (*comparing Hill v. City of Chicago*, No. 13 C 4847, 2015 WL 12844948, at *2 (N.D. Ill. May 28, 2015) (finding that the CCSAO, as a non-party, was not entitled to work product protection in civil rights litigation); *Cook v. City of Chicago*, No. 06 C 5930, 2010 WL 331737, at *1 (N.D. Ill. Jan 26, 2010) ("a non-party may not assert the work product doctrine to protect its files or documents."); *Hernandez v. Longini*, No. 96 C 6203, 1997 WL 754041 at *2 (N.D. Ill. Nov. 13, 1997) ("Courts have expressly found the privilege unavailable when a prosecutor in a prior criminal investigation later objects to discovery of her work product by a litigant in a related civil lawsuit—exactly the situation confronting the Court in this case."); *with Webster Bank, N.A. v. Pierce & Associates, P.C.*, No. 16 C 2522, 2018 WL 704693, at *4 (N.D. Ill. Feb 5, 2018) ("However, in a situation such as that presented here, where the underlying and present litigation are related, the doctrine still applies."); *Hobley v. Burge*, 433 F.3d 946, 949 (7th Cir. 2006) (work product protection "endures after termination of the proceedings for which the documents were created, especially if the old and new matters are related.").

Given this split of authority, the CCSAO's "perfunctory and undeveloped argument does not warrant the Court's opinion on whether the work product privilege applies and extends to a third-party in this case."  *DeLeon-Reyes*, 2021 WL 3109662, at *6-7.

## <u>CONCLUSION</u>

For the reasons stated above, the Cook County State's Attorney's Office's Motion to Quash Subpoena for the Depositions of Eric Sussman, Joseph Magats, Mark Rotert, and Nancy Adduci [534] is granted in part and denied in part.  While the subpoenas will

not be quashed so the depositions may proceed, the Court grants in part the CCSAO's alternative request to limit the topics that may be explored on the terms described in this Opinion. In addition, current CCSAO attorney Adduci must be deposed before the other three witnesses who are former CCSAO attorneys.

ENTER:

Dated: August 29, 2024

SHEILA FINNEGAN
United States Magistrate Judge

**Exhibit A**

**Statements to the Media/Public**

11/16/2017    "A judge on Thursday threw out convictions against 15 men who allege they were framed by a corrupt former Chicago Police sergeant and his underlings who demanded protection payoffs from residents and drug dealers in a city housing project.  Judge LeRoy Martin Jr. agreed to dismiss the charges after Cook County prosecutors confirmed at a brief hearing that they no longer had faith in the credibility of [the] convictions. . . .  'In good conscience we could not see these convictions stand,' said Mark Rotert."  Aamer Madhani, *Men who allege they were framed by crooked Chicago cop get mass exoneration*, USA Today (Nov. 16, 2017) (quoting Mark Rotert); (Doc. 568, at 11).

Rotert "declined to speak about specific evidence that led State's Attorney Kim Foxx to move to ask the courts to drop the charges.  But he noted that his unit saw a troubling trend of defendants complaining early during their prosecution that drugs had been planted on them by Watts and his officers."  (*Id.* at 12) (citing Mark Rotert).

11/16/2017    "'In these cases, we concluded that unfortunately, the police were not being truthful.  We couldn't have confidence in the integrity of their reports and their testimony.  So in good conscience, we could not see these convictions stand,' said Mark Rotert, director of the Cook County State's Attorney's Office's Conviction Integrity Unit."    John Garcia, *Mass exoneration: Convictions of 15 men, tied to tainted CPD officer, overturned*, ABC News (Nov 16, 2017) (quoting Mark Rotert); (Doc. 568, at 4).

"State's attorney spokesman Robert Foley said conviction integrity unit is looking into dozens of other cases and identified a pattern suggesting 'corrupt activity' involving Watts and 'members of his crew.'"  (*Id.* at 8) (quoting Robert Foley, spokesman for the Cook County State's Attorney's Office).

7/1/2018    "Foxx says her office struggled with the cases of Coleman and Fulton. 'The [CIU] unit itself concluded [Fulton/Coleman] was not a case of actual innocence,' Foxx says. 'But would we be able to meet the burden of proof at trial of guilt? The answer we had was no.' Still, because of the questionable interrogations and lack of evidence, Foxx concluded the charges had to be dropped. 'It troubled us,' she says. 'It pained us to try to characterize the right way to say what we were doing. These cases are really complicated.'"  Kevin Davis, *Under Questioning: The Chicago Police Legacy of Extracting Confessions is Costing the City Millions*, ABA Journal (July     1,     2018)    (quoting    Kim    Foxx),

https://www.abajournal.com/magazine/article/chicago_police_false_confessions, *archived at* http://perma.cc/98HY-XN4S.

9/24/2018    "'We continue to hear that many of these arrests were purely conjured,' said Mark Rotert, the Chief of the State's Attorney's Conviction Integrity Unit. 'They were basically arresting people and framing them or were claiming that they were involved in drug offenses that either didn't occur or didn't occur the way that those police officers said.'" Innocence Staff, *18 Exonerated in Chicago's Second Mass Exoneration*, (Sept. 24, 2018) (quoting Mark Rotert); (Doc. 568, at 26).

9/24/2018    "We could not stand behind the integrity of these convictions because of the behavior of Sergeant Watts and his crew. What we know was happening with Sergeant Watts and the way he ran his operation was that there were many men and women who fell victim to his corrupt ways." Meghan Keneally, *18 men framed by 'corrupt' Chicago police sergeant have convictions overturned*, ABC News, (Sept. 24, 2018) (quoting Kim Foxx); (Doc. 568, at 24).

9/24/2018    "Lawyers are reviewing 30 to 40 additional cases tied to Watts, according to a spokeswoman. The unit investigates only the cases that are referred to its attorneys and does not actively seek them out." Elyssa Cherney, *Top prosecutor Kim Foxx apologizes as 18 convictions linked to corrupt cop vacated*, Chicago Tribune, (Sept. 24, 2018, updated May 23, 2019), https://www.chicagotribune.com/2018/09/24/top-prosecutor-kim-foxx-apologizes-as-18-convictions-linked-to-corrupt-cop-vacated/, *archived at* http://perma.cc/M5MX-RXEL.

2/13/2019    "'We found a pattern of misconduct by Watts and other officers in these cases, which caused our office to lose confidence in the initial arrests and validity of these convictions,' Ms. Foxx said last year." Christine Hauser, *'A Stain on the City': 63 People's Convictions Tossed in Chicago Police Scandal*, N.Y. Times, (Feb. 13, 2019) (quoting Kim Foxx); (Doc. 568, at 29).

12/15/2020    "'The seeds of distrust for our criminal justice system run deeply in communities most impacted by violence because of people in power like Sergeant Watts and his cronies who targeted and criminally preyed on these communities, leaving these neighborhoods feeling like their voice didn't matter,' Cook County State's Attorney Kim Foxx said in a statement." Matt Masterson, *6 More Men Have Convictions Tossed in Cases Tied to Ex-Chicago Police Sergeant*, WTTW News, (Dec. 15, 2020) (quoting Kim Foxx); (Doc. 568, at 31).

2/19/2021    "'This is an ongoing and active investigation,' Cook County Assistant State's Attorney Nancy Adduci told the judge. 'However, as to these nine cases before you, the people have lost confidence in some of the evidence that is

the foundation of these convictions.'" Phil Rogers, *Chicago Police Scandal Continues as More Cases Thrown Out*, NBC News (Feb. 19, 2021) (quoting Nancy Adduci); (Doc. 568, at 46-47).

2/19/2021     "The claims of the defendants are not necessarily the People's findings on these matters, however, with the application of Blackston's ratio and in the interest of justice, there are enough question that we do have issues with some of the credibility of some of the evidence supporting the convictions, so we are asking, respectfully, leave to file these nine petitions for relief under 2-1401." (Doc. 567-19, Tr. of 2/19/2021 Hrg. in State Court, No. 07 CR 10335-03, at 12) (quoting Nancy Adduci).

2/19/2021     "Vacating the convictions of these nine people today who were targeted by Watts provides just a fraction of relief for those who spent time in prison, away from their families." Phil Rogers, *Chicago Police Scandal Continues as More Cases Thrown Out*, NBC News Chicago, (Feb. 19, 2021) (quoting Kim Foxx) (Doc. 568, at 48).

7/25/2021     "We will not tolerate at the Cook County State's Attorney's office convictions that were ill gotten by corrupt law enforcement." Mark Rivera, *9 more convictions from disgraced Chicago Police Sgt. Ronald Watts vacated*, ABC7 Chicago, (July 25, 2021) (quoting Kim Foxx); (Doc. 568, at 52).

11/10/2021     "Our office has been working over the past couple of years as these cases continue to come through to look at the cases on an individualized basis, to identify patterns and practices and things that we can identify that show us that this was part of corrupt behavior." Andrea Guthmann, *83 people await potential exoneration in cases tied to disgraced former CPD sergeant Ronald Watts*, "Reset," WBEZ 91.5, (Nov. 10, 2021) (quoting Kim Foxx); (Doc. 567-26; Doc. 573).

                "The reality is what happened to these men and women were that they were victimized by not just by Sergeant Watts but by a system that allowed for it to happen." *Id.* (quoting Kim Foxx).

2/1/2022     "'The people whose names were read today are victims, victims of a failed system, . . .' Foxx said." John Garcia, *Over 100 cases tied to disgraced former CPD Sgt. Ronald Watts vacated*, ABC7 Chicago (Feb. 1, 2022) (quoting Kim Foxx); (Doc. 568-1, at 4).

2/1/2022     "Prosecutors are committed to reviewing each case separately, rather than simply throwing out all cases with any connection to the crew, Foxx told reporters. 'We have to talk about them on an individual basis, it depends on who was working on the cases, the time period we're looking at, the sufficiency of the evidence, or other evidence,' she said." Megan Crepeau,

*20 more convictions linked to disgraced ex-CPD sergeant are tossed*, Chicago Tribune, (Feb. 1, 2022) (quoting Kim Foxx); (Doc. 568, at 17).

3/24/2022    "'The ultimate question before the court is whether the new evidence places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt,' [prosecutor Carol] Rogala wrote. 'The People deny that petitioner can meet this burden.'" Chip Mitchell, *State's Attorney Kim Foxx is doubling down on dozens of convictions tied to a corrupt ex-cop*, WBEZ Chicago (March 24, 2022), https://www.wbez.org/criminal-justice/2022/03/24/foxx-doubles-down-on-37-convictions-tied-to-corrupt-cop, *archived at* http://perma.cc/AMN2-MHHJ.

"Foxx's support of the Watts-tied convictions sets the stage for prosecutors having to defend the arrests in court hearings – a challenging assignment without testimony by the disgraced officers, who include Watts, the other cop who was sent to prison, and 10 officers whom Foxx's office does not call to the witness stand due to 'concerns about their credibility' because of close ties to the former sergeant." *Id.*

4/22/2022    "'The work to give relief to Watts victims is directly related to our public safety today,' Foxx said in a statement. 'In order to restore trust in the criminal justice system, as prosecutors, we must approach every case with an eye toward the facts, the evidence, and the law.'" Matt Masterson, *Judge Tosses 44 More Cases Tied to Ex-CPD Sgt. Ronald Watts*, WTTW, (Apr. 22, 2022) (quoting Kim Foxx); (Doc. 568-1, at 10).

4/22/2022    "[Assistant State's Attorney Catherine] Malloy said the opposition [to vacating] had been due to the arrests involving 'officers who have not been impugned in Watt's [sic] nefarious conduct.' But the arrests also involved cops 'discredited' because of their Watts ties, Malloy said. The role of those officers 'raises concerns about the integrity of these cases.'" Chip Mitchell, *In Cook County's largest mass exoneration, a judge tosses 44 convictions tied to a corrupt cop*, WBEZ Chicago (Apr. 22, 2022), https://www.wbez.org/criminal-justice/2022/04/22/judge-tosses-44-more-convictions-tied-to-corrupt-chicago-cop, *archived at* http://perma.cc/WHR8-UH9W.

5/2022    "'Watts, we believe, had a proclivity for doing corrupt things when he was arresting groups of people in the projects for drugs,' Rotert said, but there were other times when he was 'functioning as a police officer,' such as when he took a report at the scene of a sexual assault or homicide." Jonathan Abel, *Cop Tracing*, 107 Cornell L. Rev. 927, 948 (May 2022) (quoting Kim Foxx).

2/8/2023    "'[Watts] really carried himself as the top dog in that neighborhood, and people who didn't comply had cases put on them.' Watts, an 18-year

veteran of the department, had vendettas against some people, Foxx said. Other times he targeted people just because 'he could,' she said. . . . "'The righteous anger about this is that (Watts) did inflict all of this harm that we all know that he has done and has eluded the ultimate responsibility – not just for shaking down that one informant – but for literally these hundreds of people,' Foxx said." Grace Hauck, *A corrupt Chicago cop destroyed hundreds of lives. Now victims want justice*, USA Today, (Feb. 8, 2023) (quoting Kim Foxx); (Doc. 568-1, at 26-27).

4/25/2023     During a speech announcing she would not be seeking reelection, Kim Foxx stated:

Stand up Clarissa . . . Clarissa Glenn lived in the Ida B. Wells public housing projects and was the victim of a corrupt police sergeant, Ronald Watts. Clarrissa Glenn was given a case in which she knew she was innocent and was convicted, and not only her, but her husband. Clarissa Glenn is like me, she's a mother, and the impact that the wrongful conviction of herself and the imprisonment of her husband had on her boys …. And it has never been lost on me that these are not human-interest stories, these are indictments of a system that allows for people to prey on people in public housing, do what they will, and nothing happens. But you want to ask me about Jussie.

SA Foxx Speech, Apr. 25, 2023.